**Gustavo G. CURTIS and Vera Curtis, Plaintiffs,**

**v.**

**BEATRICE FOODS COMPANY, Defendant.**

**No. 78 Civ. 1316(MP).**

United States District Court, S. D. New York.

Jan. 4, 1980.

Herbert M. Horowitz, New York City, and Diamond, Hallinan & Polacek by Leonard W. Diamond, New York City, for plaintiffs.

Kramer, Lowenstein, Nessen, Kamin & Soll by Geoffrey M. Kalmus, New York City, and Winston & Strawn by Terry M. Grimm, Chicago, Ill., and Payan, Camargo & Cia Abogados by Adolfo Urdaneta Wiesner, Bogota, Colombia, for defendant.

## OPINION AND DECISION

POLLACK, District Judge.

### PRELIMINARY

Gustavo G. Curtis, the manager of Industrias Gran Colombia, S.A., an industrial company incorporated in the Republic of Colombia and located in Bogota was kidnapped on Bogota's streets by terrorists on September 28, 1976 and held for ransom demanded from his company beyond its and his capacity to pay. Defendant Beatrice Foods, the parent company of the victim's employer, voluntarily undertook to negotiate for his release from captivity and after protracted negotiations succeeded in freeing him alive on May 17, 1977 by payment of 15,500,000 pesos in ransom.[1]

Beatrice is now being sued by Mr. Curtis and his wife, a television personality in Colombia, because it allegedly did not do enough or do enough well enough on his behalf. Multiple claims of over $200 million are asserted in the complaint. Briefly, he says that Beatrice was in fact his employer and therefore liable to him for monetary damages under provisions of the Labor Code of Colombia akin to our Workmen's Compensation laws, or alternatively, that Beatrice having volunteered to negotiate his rescue became a so-called "officious agent" under the Civil Code and liable to him for having performed the functions of that agency inadequately. Mr. Curtis claims that he suffered a "work accident" and was emotionally disabled to return to his employment in Bogota and in consequence of the absence of any opportunity for a transfer to another locality in Beatrice's organization, he should be paid what he would have earned in Bogota until retirement age 65 or at least what his salary from defendant as his "employer" would

---

1. The Colombian peso was worth somewhat more than three cents in American money.

have totalled during two years following the termination of his employment.[2]

Mrs. Curtis joined in her husband's suit and initially asserted separate claims against Beatrice Foods for loss and impairment of consortium during and since her husband's captivity and for alleged defamation for wrongly doubting whether the kidnapping was genuine and hiring an investigator to look into this and causing her to take a lie-detector test. However, at the close of the case she consented to dismissal of those claims.[3]

The defendant, Beatrice Foods, denied legal liability to either plaintiff and claimed that its conduct was voluntary, reasonable and in good faith in freeing Mr. Curtis from his captivity and that it was not his employer or obligated to provide him with employment elsewhere.

The parties stipulated expressly that the law of the Republic of Colombia governs the open claims. Testimony as to the foreign law was adduced by defendant through Professor Henry P. deVries, an acknowledged expert in Colombian law. The plaintiffs submitted a written statement by Colombian attorneys.

The issues were tried to the Court at a Bench trial. Jurisdiction of the Court is grounded on diversity of citizenship.

For the reasons indicated hereafter, neither plaintiff is entitled to prevail herein.

*The Parties*

At the time of the kidnapping, Gustavo G. Curtis was 51 years of age. He was born in New York City but had spent the major portion of his adult life, 25 years, living and working in Latin America. He was married in Venezuela in 1964 to a citizen of Venezuela and Colombia of European birth. Mr. Curtis had no residence of any kind in the United States during this lengthy period and was not a citizen of any state. He is a tall, well built man of strong will and constitution, having served in his early years in the cavalry division of the United States Army in the Philippines after basic training. He and his wife were well aware that the area in which they lived was in a state of great unrest; that Colombia had been a violent area for half a century and was at the times involved herein under martial law and that Bogota in particular was an unsafe city; that kidnappings for ransom were a form of fund raising; and according to the testimony of Mrs. Curtis were virtually day to day news.

Nonetheless, early in 1969, Mr. Curtis left Caracas, Venezuela, to accept employment as the manager of Fabrica de Dulces Gran (Fabrica hereafter), an industrial corporation organized in Colombia and based in Bogota. Fabrica was a subsidiary of Beatrice Foods through stock ownership. Mr. Curtis and Fabrica agreed on the salary he was to receive from it together with a percentage of the profits of Fabrica's operations.

The defendant, Beatrice Foods, is a major multinational food products enterprise organized under Delaware law with its principal place of business in Chicago, Illinois. It engages in the manufacture and distribution of food products. Prior to the events involved herein it had 76 domestic and 33 foreign wholly-owned subsidiaries and in addition controlled through more than 50% stock ownership one domestic and 37 foreign subsidiaries. This worldwide group of companies was operated on a decentralized basis. The individual managers of each subsidiary or affiliate of Beatrice Foods were given almost complete autonomy and independence in the management and operation of their individual enterprise, subject principally only to oversight by the parent corporation of capital expenditures beyond a specified amount.

---

2. The sole employment contract which Mr. Curtis had was with Industrias Gran for an indefinite time of employment. See *infra* p. 1279.

3. Accordingly, Counts V and VII of the complaint were dismissed on consent after trial and the claim in the complaint for punitive damages, Count XI was dismissed by the Court as unsupported in fact and law. Decision was reserved on the remaining claims.

*The employment contract with Mr. Curtis*

Fabrica, as the employer, entered into a written employment agreement with Mr. Curtis, as the employee, for his services from March 1, 1969 for an indefinite time in which he agreed to "place at the service of the employer all his normal working capacity on an exclusive basis" with the express term that the employee was "Not to render either directly or indirectly employment services to other employers." The agreement further recites that "His services inherent in the position shall be performed exclusively in the city of Bogota, D.E., legal headquarters of the Company." The introductory portion of the contract summarizes the employment as follows:

"INDEFINITE–TIME INDIVIDUAL
EMPLOYMENT CONTRACT

| Employer: | Address: |
|---|---|
| FABRICA DE DULCES GRAN COLOMBIA S.A. | Bogota, D.E. Cra. 84 No. 18–84 |
| Employee: | Address: |
| GUSTAVO GEORGE CURTIS | Residencias Hotel Tequendama Rm. 857 |
| Place and date of birth: New York, March 10, 1925 | Citizenship: U.S.A. |
| Salary: 22,000 pesos | Payable: Monthly |
| Position: GENERAL MANAGER | Beginning: March 1, 1969 |
| Where: COLOMBIA | " |

Although the contract stipulated that the parties would not recognize the validity of any verbal stipulations relating to this contract, which according to the writing constituted the complete and total agreement on its subject matter, it was nevertheless orally understood that Mr. Curtis would receive additional salary beyond the stated sum, which had been fixed at the maximum deductible for tax purposes under Colombian law. The "unstated" amount was to be a fixed percentage of Fabrica's earnings, and was generated by the use of "off book accounts" and the fabrication of certain invoices to customers of the company.[4]

4. These arrangements were disclosed in 1977 in a special report to the Securities and Exchange

In 1971, Fabrica was consolidated with another Beatrice subsidiary located in Colombia to form Industrias Gran Colombia, S.A. ("Industrias Gran"), all of whose stock was owned by five wholly-owned subsidiaries of Beatrice Foods. Upon the consolidation, Industrias Gran succeeded to and acquired the rights and obligations of Fabrica. No new contract was made with Mr. Curtis. He became the general manager of Industrias Gran and, as such, its chief executive charged with responsibility for its regular operations and their success. It engaged in business only in Colombia; its manufacturing, sales and administrative facilities are located in Bogota, where it produces and markets snack foods, candies, chewing gum and related products. On a day-to-day basis, Mr. Curtis managed the confectionery and chewing gum division of Industrias Gran while his colleague, Emilio Grun, was responsible for the snack foods division. Apart from the submission of annual budgets and monthly financial reports to Beatrice headquarters and obtaining from it approval for individual capital expenditures in excess of $30,000, direction of Industries Gran was left to Messrs. Curtis and Grun and they continued to function for the most part independently from Beatrice Foods—it was tantamount to being the owners of the company; they had almost that latitude of freedom. Mr. Curtis' salary arrangements with Industrias Gran remained unchanged, although he was now paid a lower percentage of profits to reflect the larger profit-pool from which his salary was drawn. The sole source of the compensation paid to Mr. Curtis, however, generated and in whatever manner paid, was Industrias Gran.

In 1974 an additional agreement in writing was made by and between Industrias Gran and Mr. Curtis. This recited that he had been and was presently under agreement with that company as an employee; that to insure the availability to it of his services following termination of full time employment, Industrias Gran agreed that after he reached age 55 (March 10, 1980)

Commission by Beatrice and in Beatrice's annual proxy statement to its stockholders.

the company would employ him in a consulting capacity for 10 years in the field of marketing, sales and planning of the company. The yearly compensation was to be paid in Colombian pesos and was to be equivalent to 1% of his average yearly salary during the previous five years, multiplied by the number of continuous years of service in the company. However, should his employment be terminated, "for any reason whatsoever before 3.10.80", the consulting agreement was to be considered as thereby terminated as if never concluded. The agreement embodied a restrictive covenant against direct or indirect competition by Mr. Curtis with the company's business during the life of the prospective consulting agreement.

*The warning of danger*

In early July 1976, Mr. Curtis was requested by Mr. Stephen Gibson, a U.S. Embassy official, to visit the U.S. Embassy in Bogota. At the Embassy, Mr. Curtis was shown a photograph thought to be of him that had been found in the possession of an underworld figure. Mr. Gibson advised Mr. Curtis that this fact could indicate that he was a potential kidnap target.

Although Mr. Curtis had some doubts about whether the picture was actually of him, he was naturally concerned about the situation, and sought counsel from Emilio Grun, the Industrias executive in charge of the snack foods division. Mr. Grun told Curtis that if he were in the latter's shoes, "to hell with everything, I'd just get on a plane and get out." Short of that, however, the only advice Mr. Grun could offer was that Curtis wait until Andre Job, the president of Beatrice's Latin-American operations, arrived on the visit he was scheduled to make in a few days, and apprise him of the situation.

When Mr. Job arrived, Mr. Curtis took him to the U.S. Embassy, where Mr. Gibson again showed the picture and advised of the dangerous possibilities. After the meeting, Mr. Curtis told Job that he wanted to get out of Colombia and requested a transfer. Mr. Job told him that he didn't have authority to grant a transfer, and that it would

have to be taken up with the Beatrice people in Chicago.

During the approximately two and a half months between these events and Mr. Curtis' kidnapping on September 28, 1976, Mr. Curtis took very few, if any, substantive steps to protect himself, although, as general manager of Industrias, he had the authority to take whatever actions he thought necessary. Mr. Curtis, moreover, had had some prior training in how to deal with such situations.

In the fall of 1975, Mr. Curtis attended a security briefing in Monaco at a meeting of the managers of Beatrice's international subsidiaries. The speaker at this meeting was David Walker of Control Risks, Ltd., a London based firm engaged in rendering advice on security matters and practiced in the expanding field of kidnap negotiations. Mr. Walker counseled the audience on the precautions that should be taken to minimize the risk of kidnapping. Among other things, he emphasized the importance of avoiding predictable patterns of behavior, as by varying the routes to and from work. After the speech, two Beatrice executives informed those present that Control Risks was available to each manager to advise him in any security matters should the need arise.

Furthermore, in early 1976, Mr. Curtis attended a similar lecture at the U.S. Embassy in Bogota, arranged by the State Department's Office to Combat Terrorism. The audience was again informed of various precautions that could be taken to minimize the risk of kidnapping.

Despite having the benefit of these briefings, however, Mr. Curtis, to judge from his actions, paid little heed to the advice given. The only steps Mr. Curtis took were investigatory, not precautionary in and of themselves. For instance, he asked a security firm for a quotation for bodyguards; he initiated proceedings for getting a government permit to carry weapons; he asked his office manager to get quotations on a two-way radio unit for his car and to contact "a number of organizations" with reference to "beefing up security" at the plant. From

the evidence, it appears that Mr. Curtis failed to obtain any of the information indicated or to follow through on any of these measures.

One thing that Mr. Curtis did do, however, was to continue to ask Mr. Job about a transfer. The request for a transfer was forwarded by Mr. Job to James Dutt, Beatrice's president of the International Division. Mr. Curtis was told that it was being looked into, but that there was nothing definite yet. In fact such inquiries were made by defendant and it found that no managerial opening existed within its subsidiaries.

In August 1976, Mr. Curtis was visited by his brother, and the two went on a vacation to a resort in Colombia 200 miles outside of Bogota, and from there to the Caribbean, and from there to Miami. While in Miami Mr. Curtis contacted Mr. Job, who lived there. Mr. Curtis says he only spoke to Mr. Job on the phone, and that the answer was the same inconclusively negative one he had received theretofore. Mr. Job, on the other hand, believes that he actually saw Mr. Curtis in person at this point and told him that there were no openings available elsewhere, but his memory is somewhat hazy.

At sometime thereafter, Mr. Job again visited Mr. Curtis in Colombia, and again told him that nothing definite had developed, although he did mention to Mr. Curtis that the threat of kidnapping was "part of what it means to be an executive." At any rate, Mr. Curtis never got a transfer, and the evidence is that no suitable opening became available elsewhere in the organization. His lawyer asked Mr. Curtis why he didn't leave Colombia and his testimony was "I'm no quitter."

*The kidnapping*

On September 28, 1976, Curtis was on his way home from work when his driver turned off the principal highway into a rather narrow street and a car coming towards them struck their car. Soon another car came behind them and blocked the street in that direction. When Curtis got out of the car to see if he could get things moving, he had a gun put to him and was forced into a car.

With respect to the circumstances of the kidnapping, it appears that plaintiff could have taken a somewhat longer route home which would have kept him on main roads and not taken him on any narrow side streets. Plaintiff's chauffeur, moreover, was not a very skilled driver and the Curtises doubted his general intelligence and he was not trained to deal with this type of emergency.

Plaintiff was taken by his abductors to an unknown location, lowered down a long shaft into a 4' × 8' bare cell. He stayed there until May 18, 1977, approximately eight months. He had no means of telling time, and was occasionally psychologically but not physically tortured by his captors, as by their making false promises to bring him food or water. There is no doubt that he suffered a monstrous ordeal during his captivity.

Beatrice Foods was informed about the kidnapping within a few hours of its occurrence. No employee of Industrias was qualified to deal with such a situation—none had any experience. The matter was referred to Donald Klein, Beatrice's Director of Corporate Insurance, Employee Benefits and Safety. Although Mr. Klein—a former FBI agent—was usually put in charge of security matters, he had not prior to the kidnapping been informed of the kidnap threat. After discussion with his superiors, Beatrice decided to be of assistance and Klein contacted Control Risks and retained that firm to undertake to deal with the situation. Mr. Klein knew Control Risks to be experienced in this field, whereas neither Industrias nor Beatrice had any experience to go on.

From the time of its retention by Beatrice until Mr. Curtis' release, one or more of four Control Risks employees were in Bogota. These agents maintained daily logs of events that were regularly forwarded to Beatrice, along with reasoned recommendations as to the best course to follow. In every instance, Beatrice followed these recommendations.

The initial ransom demand made by the kidnappers was for $5 million, was sent to the house attorney for Industrias, and stated that the kidnappers would negotiate with "the company". Industrias was unable to meet any such demand. Mrs. Curtis had no such resources available to her. However, Beatrice had some years before obtained worldwide kidnap insurance (excepting Argentina) covering the risk of extortion under threat of harm to the executives of the company and its subsidiaries. The $5 million demand was the same amount that had been demanded for a Sears executive who had been kidnapped in Colombia in 1975 and ultimately ransomed after 89 days for $1.2 million.

Control Risks recommended, and Beatrice agreed that no counter offer in excess of $100,000 should be made until the kidnappers reduced their $5 million demand. No reduction in the demand was forthcoming in the numerous telephone contacts with the kidnappers until February 15, 1977, some four and one half months after the kidnapping. During this period, the company's counter-offers had steadily increased from an initial counter-offer of 750,000 pesos, or roughly $22,500, to 3.5 million pesos, or roughly $100,000. Set forth in the margin is a chronology of the kidnappers' calls, the demands and the progressive offers of ransom.[5]

Mr. Curtis testified that during his captivity he told his abductors not to be thinking about any ransom bigger than two or three million pesos because it never will be paid and they could just forget about it if that's what they were thinking of. When the kidnappers laughed at this he then said maybe the absolute maximum that he could possibly visualize would be five million pesos.

During the course of Mr. Curtis' captivity, "proof" questions were frequently asked of the kidnappers to verify that Mr. Curtis was still alive. These questions, which from their nature could only be answered by Mr. Curtis, were often not responded to for lengthy periods of time. Which is to say that, of necessity, the kidnappers controlled the frequency of contact.

Another handicap that Beatrice and Control Risks were laboring under was the hos-

5.

| Date of kidnappers' calls* | Kidnappers' demand** | Company's offer*** |
|---|---|---|
| 10/12/76 | US$5,000,000 | |
| 10/20/76 | " | |
| 10/26/76 | " | Col. pesos 750,000 |
| 10/28/76 | " | " |
| 11/ 5/76 | " | 2,000,000 |
| 11/17/76 | " | " |
| 11/18/76 | " | " |
| 12/ 2/76 | " | 2,500,000 |
| 12/20/76 | " | " |
| 12/31/76 | " | 3,500,000 |
| 1/25/77 | " | " |
| 1/26/77 | " | " |
| 2/ 2/77 | " | " |
| 2/11/77 | " | " |
| 2/15/77 | US$3,000,000 | 5,500,000 |
| 2/25/77 | " | " |
| 3/18/77 | US$2,000,000 | 6,500,000 |
| 3/22/77 | US$1,000,000 | " |
| 3/25/77 | " | " |
| 3/26/77 | " | " |
| 3/28/77 | " | " |
| 3/31/77 | " | " |
| 4/ 1/77 | " | " |
| 4/ 4/77 | " | 7,500,000 |
| 4/ 5/77 | " | " |
| 4/11/77 | " | " |
| 4/20/77 | " | " |
| 4/27/77 | Col. pesos 16,000,000 | 12,500,000 |
| 4/29/77 | Col. pesos 15,500,000 | 15,500,000 |
| 5/ 3/77 | " | " |
| 5/ 4/77 | " | " |
| 5/ 6/77 | " | " |
| 5/ 9/77 | " | " |
| 5/10/77 | " | " |
| 5/11/77 | " | " |
| 5/12/77 | " | " |
| 5/16/77 | " | " |
| 5/17/77 | " | " |

* On each date indicated there was a single telephone call from the kidnappers, except January 26, 1977, when there were three calls and May 17, 1977, when there were four calls.

** All demands of the kidnappers were for payment of the ransom in American dollars, until April 27, 1977, when they agreed to payment in Colombian pesos.

*** All offers by the company were for the payment of the ransom in Colombian pesos.

tile attitude of the Colombian authorities toward the payment of ransom. It was made manifest to defendant's representatives and to the victim's wife that the Colombian police were more concerned about catching kidnappers than with getting the victims back alive. The authorities made it clear that, although they would not directly interfere with negotiations, they felt that the Sears ransom had been excessive and enhanced the danger of such crime and they did not want a repetition of that kind of incentive to terrorists. In fact, after the ransom was paid in this case, the military authorities arrested the people involved in the negotiations with the kidnappers and kept them in prison for over two months for having dealt with terrorists to gain Mr. Curtis' release.

Because of the fear that the authorities might interfere and the more general concern about leaks, the Control Risks people advised Mrs. Curtis, who had a popular television show on Colombian television, and was very much a public figure, not to talk to anyone about what was happening. Mrs. Curtis shared the concern about her husband's well-being if the police were to be let in.

Mrs. Curtis testified at trial that she felt that the Control Risks people did not always keep her adequately informed, but also that she understood that they were worried about leaks. Although she made her dissatisfaction with the way the ransom negotiations were handled clear at trial, during the period of Mr. Curtis' captivity, she only had one suggestion. This occurred near the end of December 1976 when she visited Beatrice's Chicago headquarters and suggested that the company counter the

kidnappers' still pending $5 million demand with a 10 million peso (roughly $300,000) take-it-or-leave-it final offer. This approach was deemed inadvisable and was not utilized because Control Risks felt that if the kidnappers believed that the offer was truly final and it was not good enough, they might kill Mr. Curtis. Beatrice informed Mrs. Curtis of this. Understandably, Mrs. Curtis' principal quarrel with the negotiations was that they took too long, although she understood that the process of negotiation was necessary to procure her husband's freedom.

During the course of Mr. Curtis' captivity, Mr. Klein developed a suspicion that the kidnapping might have been a fraud, and that the Curtises were actually trying to extort money from Beatrice.[6] In January 1977, Mr. Klein engaged a private investigator to look into this possibility, but by March he had turned up no evidence of fraud. Mr. Klein was also advised by Control Risks that they thought the kidnapping was genuine.

Mr. Klein was still unsatisfied, however, and asked Mrs. Curtis to come to Chicago. When she arrived, he confronted her with his doubts and asked her to take a lie-detector test. She consented and passed the test, which took two days, and the efforts to procure the release of Mr. Curtis were continued. A bargain was finally struck with the kidnappers on April 29, 1977 for a ransom of 15,500,000 pesos.

It took another few weeks and many phone calls to establish the procedure for the exchange and the release of Mr. Curtis was ultimately accomplished on May 17,

**6.** At his deposition, Mr. Klein testified that his original suspicions were based, among other things, on the following facts: that Mr. Curtis was reputed to be a gambler and therefore might have incurred debts necessitating sums of money greater than his salary; that Curtis' chauffeur had reported that Mr. Curtis had not followed a pattern of varying his routes to and from work; that Curtis had dwelled on the possibility of being kidnapped while on vacation with his brother. Mr. Klein's suspicions were further aroused by Mrs. Curtis' suggestion of a take-it-or-leave-it offer which did not

strike Mr. Klein as a suggestion typical of a wife concerned for her husband's safety; also by the fact that within a week of his telling Mrs. Curtis that the lack of progress was due to the kidnappers' inflexibility, the kidnappers expressed a greater willingness to be flexible.

Mr. Klein, moreover, was not the only person suspicious about the kidnapping. Mrs. Curtis testified at trial that there were rumors that the kidnapping was fake, and that there was a lot of joking at her television station that her husband had really run off with another woman.

1977. He was left blind-folded on a Bogota street and told that after a wait he could remove the blindfold, find a phone, and call the number that had been penned into his hand. Mr. Curtis followed these instructions, and was soon picked up by Dr. Benito Lomanto, an executive of Industrias.

*Post-release history*

After his release, Mr. Curtis was taken to Dr. Lomanto's house. There he was reunited with his wife and introduced to Mr. Klein who had come down to Colombia and now asked Mr. Curtis to see a doctor. Mr. Curtis was given a brief physical examination that night, and within the next few days was thoroughly examined by several different doctors, including his family doctor. It appears that the main physical effect that captivity had on Mr. Curtis was the weight loss of approximately 45 pounds.

Mr. Curtis was forced by the authorities to remain in Colombia for several weeks thereafter. In early June, he and his wife flew to Miami, where he was examined by Dr. Beshany, who was Andre Job's doctor. Based on his examination, Dr. Beshany predicted full physical recovery within 90 days, and recommended that Mr. Curtis be reexamined at that time.

From June to September 1977, the Curtises vacationed at various resort hotels in the United States. Beatrice Foods paid all the expenses during this period of recuperation. On October 5, 1977, Mr. Curtis was re-examined by Dr. Beshany, and found to have almost fully recovered physically. Dr. Beshany found, however, that there were certain lingering psychological effects, and recommended that Mr. Curtis see a psychologist for treatment of these problems.

Almost from the time of his release until a meeting with Beatrice executives on November 9, 1977, Mr. Curtis represented to Beatrice that he intended to resume his position in Colombia. From time to time, Mr. Curtis sought to keep himself informed of Industrias Gran's progress through conversations with Mr. Job and Mr. Grun, and even told Mr. Grun about certain changes he was going to make when he got back. In one conversation with Mr. Grun, however, Mr. Curtis mentioned that he had been to see a lawyer who recommended him to a psychiatrist (he turned out to be a retired doctor) and he told Mr. Grun that he was contemplating a large lawsuit against Beatrice. Mr. Grun informed Beatrice of this conversation, but Beatrice continued—at least for several months—to take Mr. Curtis at his word that he intended to return to Colombia.

On November 9, 1977, at a meeting called by Beatrice to discuss Mr. Curtis' return to Bogota, Mr. Curtis informed Beatrice for the first time that he was unwilling and emotionally unable to return to Colombia. Mr. Curtis stated his willingness to work anywhere else in the world, and asked for a transfer so that he might continue to serve in the organization. The Beatrice officials, being unprepared for this turn of events, told Mr. Curtis that his own statements were that he planned to return to Colombia, that this was where he was needed, that Bogota was where he had been hired to work. Mr. Curtis made no denial of this and asked for a few weeks to think it over.

On November 23, 1977, Mr. Curtis again met with Beatrice officials, who reiterated that they had found no other opening at his level of employment, and that Mr. Curtis was still expected to return to Colombia. The meeting ended with the understanding that Mr. Curtis was to return to Colombia. Mr. Curtis, however, again visited the psychiatrist and then decided not to return to Colombia. Beatrice learned of this decision when it received a letter from Mr. Curtis' attorney dated December 16, 1977. When Beatrice officials communicated with Mr. Curtis to discuss the letter, he refused to talk about it; and Beatrice decided to treat this as indicative of resignation. On December 30, 1977, Mr. Curtis attempted to purchase 100 shares of Beatrice stock on a stock option available to employees of subsidiaries and his check was returned to him.

Although it appears that at some point Mr. Curtis was "reinstated", Mr. Curtis received notice from Dr. Lomanto of Industrias Gran in a letter dated June 1, 1978, that unless he reported for work within a speci-

fied period of time, his employment would be deemed terminated pursuant to the Colombian Labor Code. As required by Colombian labor law, transportation was supplied in advance. Although Mr. Curtis' failure to appear by the date specified would, under Colombian law, have provided "cause" for termination, Industrias subsequently paid him all moneys due as if termination had been effected without cause.

Mr. Curtis acknowledged in Court and in a letter sent to Industrias in August 1978 that he had received all salary and bonuses due him under the terms of his contract with and employment by Industrias Gran.

Since late in the fall of 1978, Mr. Curtis has been self-employed, managing a small loan business in Laredo, Texas. He describes himself in his resume as being in excellent health, and his appearance in court supported this assertion. Mr. Curtis complains of lingering psychological effects, such as inability to concentrate, irritability, anxiety and insomnia.

### Discussion

As noted above, the open claims in this case have been stipulated, and correctly so, to be governed by the law of Colombia. Under Rule 44.1, Fed.R.Civ.P., "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Although plaintiff did not present an expert witness at trial,[7] this Court has given full consideration to the Affidavit on foreign law made by Colombian lawyers and the post-trial memorandum submitted by plaintiff, as well as the argument in summation of plaintiff's counsel, on the question of Colombian law. This is consistent with this Court's view that "foreign law should be argued and briefed like the domestic law." Pollack, *Proof of Foreign Law,* XXVI American Journal of Comparative Law 470, 475 (1978). Expert testimony is no longer an invariable necessity in establishing foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities. *Id.* at 474, and cases cited therein.

Thus, although this Court has found the authoritative opinions and testimony of Professor deVries extremely helpful, and has found itself in agreement with almost all his opinions, it has fully conducted its own examination of the authorities provided, and given full consideration to the contentions of plaintiffs.

Although plaintiffs' complaint asserted eleven separate claims for relief, by the end of trial, plaintiffs had narrowed their attack to three basic legal theories: (1) Curtis was Beatrice's employee, and as such is entitled under Colombia's Labor Code to a statutorily fixed compensation for injuries sustained in a "work accident"; (2) Curtis suffered injuries as a result of Beatrice's fault, and is therefore entitled to compensation under Colombia's Civil Code; (3) Beatrice became Curtis' "officious agent" when it assumed to rescue him, and failed to meet the applicable standard of care in conducting the rescue operations, and is thus liable to him for damages. These claims will be discussed *seriatim.*

I. *Labor Code theory*—Plaintiff's first legal theory is that Curtis was Beatrice's employee, and, under Colombia's version of workmen's compensation, is entitled to damages for injuries stemming from the kidnapping, which is here claimed to have been a "work accident", the requisite for such compensation.

### Employment relationships under the Colombian Labor Code

Under Article 24 of the Colombian Labor Code, "The labor relationship of individuals is presumed to be governed by an employment contract." Article 22 defines an employment contract as

---

**7.** Plaintiff failed to produce an expert witness for pre-trial deposition, in accordance with this Court's pre-trial Order No. 1. Consequently, plaintiff was precluded from presenting an expert witness at trial.

an agreement whereby an individual undertakes to render a personal service to another, be it a natural person or legal entity, under the continuing dependency or subordination of the latter and for a remuneration.

Article 23 sets forth the three essential elements of an employment contract:

1. Personal activities carried out by the employee, that is, performed by him;

2. A continued subordination to, or dependence of the employee with respect to the employer, which authorizes the latter to demand compliance with orders at any moment, as to the mode, time or amount of work, and to impose shop rules, such subordination and dependence to be maintained during the period of the contract; and

3. A salary as compensation for the service.

The employment contract may be written or oral, and requires no special form, in the absence of an express provision to the contrary. (Article 37, Labor Code.) An employee "may enter into employment contracts with two or more employers, unless the exclusivity of services has been agreed upon in favor of only one." (Article 26, Labor Code.)

If an employment contract exists, Colombian law imposes a limited duty on the employer to compensate the employee for injuries sustained in work accidents. Article 199 of the Labor Code defines "work accident" as

any unforeseen and sudden event caused or occasioned by the work, which produces a physical injury in the worker or a permanent or transient functional disorder, and which has not been provoked deliberately or by the grave fault of the worker.

Article 209 provides a schedule of recovery for work accidents, graduated according to the severity of the injuries suffered. The most an employee may recover is 24 months' salary plus medical expenses for two years.[8]

An employee sustaining injuries in a work accident is entitled to this statutorily fixed indemnification from the employer even if the employer is without fault, unless the accident was "provoked deliberately or by the grave fault of the worker."

Given this statutory framework and the facts proven at trial, it is clear that plaintiff has not made out a claim under the Labor Code by a fair preponderance of the credible evidence.

*Plaintiff was not Beatrice's employee*

Plaintiff has failed to demonstrate that his relationship with Beatrice was that of employer and employee or has met the essential criteria required to prove an employment contract with Beatrice.

The evidence did not show that Mr. Curtis rendered services to Beatrice in a relationship of continued subordination within the meaning of the Colombian Labor Code and as is necessary to establish an employer-employee relationship. As described by Mr. Curtis, his employment activities were "to see to the successful operation of the organizations within Industrias Gran Colombia S.A." In other words, he undertook with Industrias (formerly Fabrica) to serve Industrias by making it as profitable a corporation as possible.

Of course these efforts would redound upstream to the benefit of Beatrice as the ultimate shareholder of Industrias, but this in itself is not sufficient to render Mr. Curtis the employee of Beatrice. Under Colombian law, "A company legally organized constitutes a legal person independent of its members." (Article 98, Commercial Code.) Moreover, under Colombian law, a Court may not "pierce the corporate veil" except by express statutory provision. Thus, the mere fact of stock ownership is irrelevant to the question of whether Beatrice may be cast in the mold of Mr. Curtis' employer.

**8.** Plaintiff is of the opinion that his injuries fall under Item 26 of the table, which includes "Cerebral traumatisms with their definite consequences on the nervous system or on the digestive or locomotive apparatus, etc." Injuries of this nature entitle an employee to between 18 and 24 months' salary.

Even if this Court were empowered to "pierce the corporate veil", however, there has been no evidence that would justify exercising the power. Rather, resolution of the facts established that Industrias was an extraordinarily autonomous subsidiary, whose independent corporate identity was scrupulously recognized by Beatrice.

Thus, Andre Job, the president of Beatrice's Latin-American operations, testified at his deposition that Beatrice's subsidiaries

> are run totally independently from Beatrice Foods headquarters. Total autonomy . . . to do whatever they please for the eventual benefit of the particular company.

This testimony is corroborated by the statement in Mr. Curtis' own recent resume which describes his experience with Industrias Gran as

> General Manager of this wholly-owned subsidiary and autonomous profit center of Beatrice Food Company . . . Fully responsible for organizing and directing all operations. . . . (Ex. Q).

Moreover, it has been stipulated that

> Apart from the submission of annual budgets and monthly financial reports to Beatrice headquarters and obtaining from it approval for individual capital expenditures in excess of $30,000, direction of Industrias Gran was left to Messrs. Curtis and Grun.

That Industrias submitted financial reports to Beatrice, of course, shows only that Beatrice kept informed about how its subsidiaries were faring, not that it exercised any dominion over them. Nor is the residual control over capital expenditures in excess of $30,000 the kind of day-to-day control contemplated by Article 23 of the Labor Code, *i. e.*, authority to "demand compliance with orders at any moment, as to the mode, time, or amount of work, and to impose shop rules."

█ In the final analysis, plaintiffs' claim that Mr. Curtis was under the continued subordination of Beatrice, and therefore its employee, rests almost entirely on one fact: that Beatrice had the power to cause his discharge. Again, however, this power

stemmed merely from Beatrice's stock ownership of Industrias. Corporate officers are always ultimately answerable to the stockholders, but they do not for that reason cease to be corporate employees or become employees of the stockholders themselves. There being, as stated above, neither fact, reason nor authority for this Court to pierce the corporate veil in this case, Beatrice's capacity, as sole shareholder, to cause his dismissal is not enough either under the facts herein or the law to establish an employer/employee relationship between Mr. Curtis and Beatrice.

Plaintiffs' proof is likewise deficient on the question of compensation, it being another essential element of the employment relationship that the employee receive a salary from the employer for the services rendered. The evidence indicates that Mr. Curtis was paid by Industrias Gran, not Beatrice Foods. In fact, it has again been stipulated that

> Mr. Curtis received a salary from Industrias Gran at the maximum amount permitted by Colombian law, if the salary was to be deductible for Colombian tax purposes as an expense of the business. In addition, Mr. Curtis received further compensation from Industrias Gran based upon its earnings. As Mr. Curtis knew, payment of this additional compensation was achieved through the use of "off-book" accounts and the fabrication of certain invoices to customers of Industrias Gran.

Plaintiff now seeks to controvert, or at least avoid this stipulation by introducing two checks drawn by Beatrice on which Mr. Curtis was payee. One of these, for approximately $6,000 was issued in 1971, five years before the kidnapping, and represented a method of paying Mr. Curtis' "bonus" that was discontinued shortly thereafter by Industrias' legal department. The other was a check for around $18,000, which represented Mr. Curtis' "bonus" from Industrias for the period from January 1, 1977 to May 31, 1978. This amount was originally credited to Mr. Curtis' Bogota account, and apparently was only cashed by Beatrice be-

cause Mr. Curtis refused to go or send down to Colombia to pick it up.

In fact, Mr. Curtis' close associate Emilio Grun testified at his deposition that, except for the $6,000 referred to above, that "every single cent" paid to Mr. Curtis came from Industrias.

Plaintiffs, however, also point to Mr. Curtis' privilege to participate in a stock option plan of Beatrice's as being compensation indicating an employment relationship. This, however, was merely a privilege afforded to overseas managers to acquire an interest in Beatrice and not payment for services rendered, or salary within the meaning of the Colombian Labor Code. Given the stipulation with regard to salary and the overall shortcomings of the proof on this point, this fact does not have enough force to establish that Beatrice was Mr. Curtis' employer.[9]

Finally, there is the written employment contract between Mr. Curtis and Fabrica, which, if it does not preclude altogether Curtis' contention that he was Beatrice's employee, militates strongly against it. In that contract, Mr. Curtis promised to render his services exclusively to Fabrica and in Bogota. Upon the consolidation of Fabrica into Industrias, under Article 172 of Colombia's Commercial Code, Industrias acquired the "rights and obligations of the dissolved company." Thus it was entitled to the benefit of this employment contract, which, under Article 26 of the Labor Code, would appear to foreclose the possibility of Mr. Curtis' entering into an employment relationship with Beatrice.

Plaintiff seeks to avoid this conclusion by arguing that the contract did not express the full arrangement because from the outset Curtis received a salary greater than that set forth in the contract, and from time to time received pay increases without amendment of the contract. Given, however, the clause in the contract disclaiming "verbal stipulations relating to this contract", these side agreements if not observed would not be enforceable under Colombian law according to Professor De-Vries. *See* Article 37 of the Labor Code to the same effect.

Even if, however, the contract were not to be given conclusive effect, it is strong evidence that Curtis understood that he was to be the employee of Fabrica resp. Industrias and not Beatrice itself.[10]

In sum, plaintiff has not as a matter of fact established an employment relationship between him and Beatrice. If he had shown any direct relationship between him and defendant, it would be characterized under Colombian law as that of "mandato", or principal/agent. Article 2142 of the Colombian Civil Code defines "mandato" as a "contract in which one person confides the management of one or more matters to another, who takes charge of them for the account and risk of the first party."

Here, the independence with which Mr. Curtis dealt with Industrias, "[t]he confidence placed in him, the authority to act for [the] account of the owner and the handling of interests of another with the duty to account places [Curtis] in the category of a true mandatary." *Aldana v. Rodriguez Maldonado* (Supreme Court of Colombia, Cas.Civ., October 3, 1939, 48 Gac.Jud. 701. The mandato relationship is not governed by the Labor Code and the mandatary is not treated as an employee under that Code. *Aldana, supra.*

Since plaintiffs have not established that Mr. Curtis was an employee of Beatrice

---

**9.** Moreover, there was no proof as to the value of the options. Since the option privilege was the only consideration shown to have passed from Beatrice to Curtis, and thus the only conceivable "salary" paid to him by Beatrice, this poses a problem: even if plaintiffs' Labor Code theory were held to be correct the most they would be entitled to would be the monetary equivalent of 24 months' worth of the privilege to acquire options at the market price, which privilege was of indeterminate and possibly no value in the future.

**10.** That the contract denominated Fabrica as the employer certainly undercuts any significance that might have attached to the fact that Mr. Curtis was hired as general manager in part through discussions with Beatrice personnel.

Foods and since no part of his salary was paid or payable by Beatrice, he is not entitled to the statutorily fixed indemnification provided for in the Labor Code nor is there any amount of "salary" from Beatrice by which that could be measured.

*Plaintiff's kidnapping was not a work accident*

A work accident must, as defined by the Labor Code, be "caused or occasioned by the work." This requirement was addressed by Colombia's Supreme Court in *Torres Garcia v. Lara e Hijos Limitada*, (Supreme Court, Labor Section, September 26, 1969, Gaceta Official Nos. 2314/15/16 (bis) p. 392). In that case, a plant manager informed an employee that henceforth his wages would be paid by a different division of the company. The next day, the employee's brother appeared at the factory, accused the manager of firing his brother, and attacked him with a machete. The Court held that the incident met the definition of a labor accident insofar as it was "an unforeseen and sudden event which produced a permanent injury not provoked deliberately by the victim nor due to his fault," but that "the causal connection between plaintiff's work activities and the injuries suffered was not proved." Recovery was denied.

Thus it appears that Colombia's Supreme Court requires that the accident be caused by the nature of the work activities, and not merely occur in connection with them; essentially, that the work be a proximate or legal cause, and not merely a but-for cause. Plaintiff has not demonstrated the necessary causal relationship in this case. Indeed, the causal link in ·*Torres Garcia*, where the accident occurred at the work site and stemmed from a particular order given by the injured employee, would certainly seem stronger than that in the present case.

The only evidence that plaintiff has provided on causation is that the kidnappers demanded ransom from, and refused to deal with anybody but, "the company." While it seems in any event dubious jurisprudence to base legal consequences on motives, methods, and assumptions (false or correct) of kidnappers, the fact is inconclusive at best. In light of the fact that Mr. Curtis was married to a well-known, highly visible, attractive television personality, and led a less than reclusive lifestyle, the inference is strong that Mr. Curtis was kidnapped not because of his "work activities", but because of what he represented—a well-to-do corporate executive with a high public profile. It was Mr. Curtis' status, not his job *per se*, that made him a chosen target of kidnappers.

That the kidnappers demanded ransom from "the company" shows at most that they were after a deep pocket, and correctly perceived that Industrias Gran and possibly its parent would not sit idly by while Mr. Curtis' life was in danger. It does not prove that the kidnapping was caused by Mr. Curtis' work activities in the sense required by the Colombian Supreme Court in Torres Garcia.[11]

Since Mr. Curtis' kidnapping does not meet the requirements of a work accident, as that term has been construed by Colombia's highest court, plaintiffs would not be entitled to recover under the Labor Code even if Mr. Curtis were to be considered Beatrice's employee.

## II. Civil Code theories

A. *Fault theory*—Plaintiffs' next theory is that Mr. Curtis sustained injuries caused by Beatrice's fault and compensable under the Colombian Civil Code. In essence, plaintiffs here claim that Mr. Curtis' kidnapping was caused by Beatrice's unreasonable failure to transfer him as requested.

---

11. Moreover, to the extent that the kidnapping was caused by anything other than the depravity of the kidnappers, it could be said to have been caused by the grave fault of Mr. Curtis, who had the authority to take steps to protect himself, and failed to do so. Furthermore, in light of the warning Mr. Curtis received from the Embassy, it might well be wondered whether the kidnapping was an "unforeseen" event within the meaning of the Labor Code.

Article 2341 of the Civil Code provides that "[w]hoever has committed a delict or fault, which has caused damage to another, is obligated to indemnify [the injured party]." Article 63 defines "fault" as "the absence of that diligence and care that men usually employ in their own affairs," and as being "in contrast to ordinary or average diligence or care."

Article 2357 sets forth the Colombian variant of comparative negligence by providing, "The evaluation of the injury is subject to reduction if the one who suffered it exposed himself to it imprudently."

*Curtis' kidnapping was not caused by any fault on Beatrice's part*

The claim that Mr. Curtis' kidnapping was caused by Beatrice's fault is somewhat startling in light of the stipulation of the parties that "Mr. Curtis had the authority as the chief executive of Industrias Gran to undertake any actions that he thought proper to enhance his personal security." From the stipulation and the other proof at trial, it appears that as between Beatrice and Mr. Curtis, it was the latter who was charged with the duty of protecting himself, and that if the kidnapping was anybody's "fault", it was Mr. Curtis'.

Plaintiffs, however, resist this conclusion by arguing that the only measure that could have effectively prevented the kidnapping was Mr. Curtis' removal from Colombia.[12] According to plaintiffs, Beatrice, by failing or refusing to transfer Mr. Curtis, placed an unreasonable impediment to his leaving Colombia (*i. e.,* loss of his job), and thereby "caused" his kidnapping.

To begin with, the evidence is that Beatrice made a good faith, duly diligent effort to find an opening elsewhere suitable to Mr. Curtis' status, and that none was available. Thus Beatrice committed no fault when it "failed" to transfer Mr. Curtis—there was simply no place to transfer him to.

At any rate, however, plaintiffs have provided not the slightest legal or factual support for their novel argument that Beatrice

was under a duty to transfer Mr. Curtis. That plaintiff was a potential kidnap target was not Beatrice's "fault"; that Mr. Curtis stood in danger of losing his job if he permanently absented himself from Colombia was certainly not Beatrice's "fault". Mr. Curtis, a resident in Latin-America for a quarter of a century, had signed a contract with Fabrica promising to render services for an indefinite time exclusively in Bogota. The evidence and the reasonable inferences to be drawn therefrom negate any notion that Mr. Curtis was given any assurance by his employer or by Beatrice that he would be protected against the occurrence of a kidnapping and if necessary would be transferred to another employment and no fault of the defendant in that regard was credibly established. Beatrice did not at any time hold out any hope or assurance for a transfer of employment from Bogota; it practised no deception in that regard. There is no basis for imposing a legal duty on Beatrice to transfer Mr. Curtis.

Moreover, even if contrary to the facts found herein, there had been some fault involved in Beatrice's failure to transfer Mr. Curtis, it would not in these circumstances be considered to have "caused" his kidnapping. Under Colombian law, Mr. Curtis would be held to have assumed the risk and thus to be barred from recovery. Thus, in *Obando v. Municipality of Santa Rosa de Cabral* (Supreme Court of Colombia, Nov. 18, 1940, 50 Gac.Jud. 437), plaintiff sued the municipal utility for the death of his son, who was electrocuted by a fallen wire. Even though the fault of defendant was established, the victim was held to have assumed the risk because he disregarded the warning of his two companions not to touch the wire.

Here Mr. Curtis knew when he signed the contract promising to render services in Bogota that Colombia was a dangerous place in which to live. But he particularly knew it was a dangerous place to live in after he was warned by the Embassy that he was a potential kidnap victim. That this was a

---

12. When asked by his counsel, "Was there any safe place in Colombia to hide?" Curtis gave

the totally unsubstantiated, self-serving reply that, "If they want to get you, they'll get you."

risk inherent in his job was brought home to him again by Andre Job, who told him that this was part of what it meant to be an executive in that area.

Mr. Curtis was not in bondage; rather he was a freely mobile sophisticated businessman who knew that Beatrice was not at his beck and call in matters of transferral. At the point where Mr. Curtis learned there was a particular threat to his safety, he had open to him the alternatives of staying, or—in the words of Emilio Grun—saying "to hell with everything," and leaving. The fact that Beatrice did not make it easier for him to leave by offering a job elsewhere (which was unavailable at all events) is not a basis of liability, and would not under Colombian law be considered to have caused the kidnapping.

Of course, the fact that Beatrice was not Mr. Curtis' employer only makes the inadequacies of this theory that much clearer. However, even if Beatrice had been Mr. Curtis' employer, this theory could not succeed. The only arguable support that plaintiff has provided is in Article 56 of the Labor Code, which provides that "In general, the employer is subject to obligations of protection and security of the employees." There is no credible evidence that Mr. Curtis' employer or Beatrice breached any duty to provide plaintiff with a safe place in which to work. The kidnapping was not caused by the character of the place of work; it occurred on Bogota's streets. On the other hand, Beatrice had schooled Mr. Curtis in how to protect himself from the threat of kidnapping, and had put an expert agency at his disposal—Control Risks, Ltd. —to help him if need be. Since Mr. Curtis further had authority to take any necessary precautions, Beatrice had certainly fulfilled any "general obligation" it might hypothetically have been subject to had it been his employer.

*Plaintiff did not suffer any damages compensable under Colombian law*

█ Even if Beatrice's "failure" to transfer Mr. Curtis were to be deemed to have caused his kidnapping, plaintiff did not suffer any legally compensable injuries therefrom.

Unfortunately, under Colombian tort law, only two kinds of damage are recoverable: material damages and moral damages. Material damages are simply pecuniary loss. Moral damages, while somewhat analogous to the American concept of pain and suffering, are an extremely limited category of damages. First, recovery of moral damages is limited by statute to 2,000 pesos (about $60).[13] More importantly, however, moral damages are only recoverable for pain and suffering associated with medically established permanent deformity and consequent depression. Pain and suffering in the normal American sense apart from a physical impairment or wound are not compensable at all.

Thus in the case *Uribe v. Nation* (Supreme Court of Colombia, March 4, 1943, 55 Gaceta Judicial 371), the Court stressed:

> *[M]oral damage* as the court has expressed in numerous decisions cannot be confused with physical pain or sentiment or suffering inherent in every physical injury or wound that one receives in one's body. *This kind of injury is not compensable in any form.* What must be understood by non objective moral damage in the case of injuries or wounds suffered by a person is the psychic depression to which the victim is submitted when the wounds or injuries lead to deformities which affect permanently and definitely the physical and functional integrity. (Emphasis supplied)

The lingering emotional effects of the kidnapping on Mr. Curtis, while undoubtedly real, do not fit this definition of moral damages.

Nor has Mr. Curtis suffered any compensable pecuniary loss under Colombian law from the kidnapping. Mr. Curtis has expressly acknowledged—correctly—that ulti-

---

13. This statutory limitation was recently increased by Court interpretation to about 30,000 pesos (about $900).

mately payment was made to him of all the labor benefits due him under Colombian Labor Law as well as the agreed profit participation.[14]

In sum, it appears that Mr. Curtis would not be entitled to monetary damages on the facts of this case under either the Labor Code or the Civil Code even if a sound fault theory were asserted against Beatrice by reason of the kidnapping.

■ B. *Officious agency theory*—Plaintiffs' final theory is that when Beatrice voluntarily stepped in to negotiate Mr. Curtis' release, it became, under Colombian law, his "officious agent" (sometimes labelled in this country as the "good samaritan.") As such, it was obligated to conduct itself in accordance with the standards of care imposed by law, and this, plaintiffs say, it failed to do.

Under Article 2304 of the Civil Code, an officious agent is simply one who, without mandate, manages certain matters for another. Under Article 2306, if the putative agent has taken charge of the matters "to save the interest of another from imminent peril he is liable only for *intent to injure*, or *grave fault* . . . unless he has . . *prevent[ed] others* from doing it, in which case he is liable for any fault." (Emphasis supplied).

Plaintiffs claim here that Beatrice prevented anyone else from coming to Mr. Curtis' assistance, and thus is liable for any fault it committed in negotiating his release.

However, the evidence at trial established that there was no intent of Beatrice to injure Mr. Curtis, nor any fault grave or otherwise on the part of Beatrice, nor did Beatrice prevent anyone—in particular, Mrs. Curtis—from trying to rescue Mr. Curtis. Although Mrs. Curtis testified at trial that Beatrice "prohibited" her from dealing with the kidnappers or helping her husband, this seems a rather too convenient hindsight view and the testimony is not credited. It appears that what Mrs. Curtis expresses as a prohibition was really the strong—and probably sound—advice of the Control Risks people that she not gossip with anyone about the status of her husband and the on-going negotiations for his freedom.

Control Risks in fact had no way of preventing Mrs. Curtis from, say, contacting the local authorities, or hiring another security firm, or from taking any other action she thought necessary. At her deposition, when straightforwardly asked, "Did anyone at any time do anything to prevent you from talking to whoever you wanted to about the kidnapping to get help?" Mrs. Curtis answered "No, no." As noted above, Mrs. Curtis shared Control Risks' assessment of the viewpoint of the local authorities and agreed that it was best that they not be drawn in. Mrs. Curtis admitted at trial that she had no funds with which to meet the kidnappers' ransom demands, and that, moreover, the kidnappers stated they would deal only with "the company". Mrs. Curtis clearly had few or no viable alternatives to accepting the services of the Control Risks people; however, it was the nature of her circumstances that "prevented" her from otherwise coming to her husband's assistance, not defendant or Control Risks.[15]

---

14. As noted above, Industrias chose to treat the termination as being without cause, and compensated Mr. Curtis accordingly. It appears that under the Labor Code, this treatment of the situation may have been more generous than obligatory. Under Article 51, an employment contract is suspended by an "accident which temporarily prevents its performance." Under Article 52, "when the causes of temporary suspension of the employment disappear, the employer must give notice . . . of the date of the resumption of work." This is precisely what was done in Mr. Curtis' case. Since failure of the employee to return to work after cessation of the cause of suspension of the contract, under Article 61, terminates the contract, Curtis may not have been entitled to compensation for termination without cause.

15. Plaintiffs make the inapposite argument that Mrs. Curtis meets the definition in Article 1513 of the Civil Code of someone acting under duress. Not only is that section irrelevant insofar as it deals only with duress as a defense to a contract action, but, what is of more importance, any arguable duress stemmed from the actions of the kidnappers, not from Beatrice.

Since defendant did not prevent others from coming to Mr. Curtis' aid, and since it indisputably intervened on his behalf to "save [his] interest[s] from imminent peril", Beatrice would be liable only for grave fault committed in its handling of the ransom negotiations. The record contains no credible evidence that comes close to meeting this standard. On the contrary, it has been adequately established with credible evidence that defendant did not commit any fault in its handling of the negotiations.

Defendant concededly had no experience in conducting ransom negotiations. Faced with a staggering demand for $5 million, Beatrice could have washed its hands of the whole affair without incurring any legal liability. However, it instead took the conscientious course of hiring a firm it knew to have dealt with kidnap situations previously to master-mind the negotiations. From that point until Mr. Curtis' release, Beatrice reasonably and fairly accepted and followed the advice of its hired experts.

Plaintiffs have pointed to no instance in which it might have been a fault on Beatrice's part to follow Control Risks' procedures and recommendations. Rather they seek through argumentative suggestion and implication to insinuate that Control Risks or Beatrice, or both, were not using their best efforts. Plaintiffs, for instance, place great emphasis on the fact that Mr. Klein harbored suspicions about the genuineness of the kidnapping some six months after the fact. However, Mr. Klein testified, and his testimony was credible, that the only time he told Control Risks to "take it easy" because of these doubts was during the brief moments when he asked Mrs. Curtis to take the lie detector test. Mr. Klein testified: "Immediately preceding Mrs. Curtis' taking of the lie detector test we suggested that if anything came up, to go slow until we had the results of that test." [16] Thus, delay, if any, caused by Mr. Klein's doubts represented approximately two days, late in the period of captivity.

As the official charged with protecting both Mr. Curtis' and Beatrice's interests, it cannot be said that Mr. Klein was unreasonable and at fault merely to investigate the possibility of fraud. Moreover, in view of the fact that Mr. Curtis was held captive some eight months, no compensable damages could be assigned to this problematical two day delay.

Plaintiffs also point to the statements in one of Control Risks' reports that they (Control Risks) felt that some antipathy within Beatrice existed towards Mr. Curtis, and that it would be unfortunate if this were to influence decisions unduly. Whether or not there was "antipathy" towards Mr. Curtis, this statement does not indicate that any decisions were unduly influenced thereby, nor does any other evidence produced by plaintiffs. And again, in response to the plaintiffs' implications in this regard, Mr. Klein credibly testified that in fact no decisions were "unduly influenced" by any putative antipathy.

Similarly unpersuasive is the fact that a Sears official informally advised Mr. Klein that a Sears representative in Bogota had been told while at the U. S. Embassy that the feeling among the criminal element in Bogota was that Beatrice was not handling the negotiations properly. Even if this triple hearsay had been reliable enough to act on, it might as easily be taken to indicate that the kidnappers had begun to realize they had better adjust their expectations to a lower-than-hoped-for ransom and not that Control Risks was actually doing an incompetent job.

At bottom, plaintiffs rely on only two points to "establish" that Beatrice was at fault in handling the negotiations: (1) that Sears was able to get its man out in 89 days (though at a cost of $1.2 million) whereas it took Beatrice eight months; and (2) Beatrice had kidnap insurance and thus could have reached an agreement for Mr. Curtis' release by offering much more sooner.

---

**16.** The Court asked Mr. Klein, "So that up until March of 1977 [when Mrs. Curtis took the lie detector test], there was no slowdown of the negotiations by you or instructions to Control Risks to slow down, is that correct?" Mr. Klein responded, "Absolutely not. That is correct."

The problem with plaintiffs' position is that, in essence, it asks this Court to second guess the whole negotiation process, read the kidnappers' minds, and speculate the point at which some unannounced offer would have appealed to the kidnappers in the on-going negotiations.

Far from showing that Beatrice committed any fault as Mr. Curtis' officious agent in maintaining a tough bargaining position to endeavor to weaken the leverage of the kidnappers, all that the alleged "conflict" shows is that Beatrice was doing its best in an extremely difficult, delicate position; and it would seem that Beatrice did quite well simply to get Mr. Curtis out alive.

In sum, the record fails credibly to show that Beatrice failed to exercise due diligence or breached any duty as an officious agent.

Finally, it should be noted that plaintiff failed to show that he suffered compensable damages under the law of the Republic of Colombia. "Officious agency" is a quasi-contractual concept, and under Colombian law, only pecuniary loss is recoverable in contract actions. As discussed above, the only pecuniary loss that plaintiff could or does claim is loss of a limited amount of salary due to the termination of his employment with Industrias. For the reasons discussed above, Mr. Curtis has not proved and would not be entitled to these damages in any event.

In conclusion, there is no basis in the credible evidence to sustain a recovery for the plaintiffs on any theory. The defendant has adequately shown among other things already mentioned that it was not at fault, that it did act reasonably, fairly and diligently in the unfortunate situation in which the parties were plunged by terrorist acts for which neither was responsible. The issues of credibility herein excepting the matters of the captivity are resolved in favor of defendant. The defendant is entitled to judgment dismissing all of the plaintiffs' claims, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Federal Rules of Civil Procedure.

SO ORDERED.