Jack NOTTINGHAM, et al.,
Plaintiffs-Appellees,

v.

GENERAL AMERICAN COMMUNICA-
TIONS CORP., et al.,
Defendants-Appellants.

No. 85–1732.

United States Court of Appeals,
Fifth Circuit.

March 6, 1987.

Stuart A. Jackson, John A. Harras, Law Offices of Stuart A. Jackson, New York City, for defendants-appellants.

Lewis T. LeClair, John A. Gilliam, Jenkens & Gilchrist, Dallas, Tex., for plaintiffs-appellees.

Before BROWN, RANDALL, and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

The district court awarded disgruntled investors damages and partial rescission of agreements and promissory notes related to the rights to produce and exploit children's educational video programs featuring Felix the Cat. We affirm.

## I

### A

Stuart R. Ross conceived of and marketed the "1981 GAC Video Production Program," a tax shelter and investment program that included the rights to produce and exploit children's educational video programs. Investors were to receive substantial revenues from the distribution of the video programs, as well as substantial tax deductions and credits available to them as "producers" of the shows under 26 U.S.C. § 48(k). Ross marketed and managed the investment program through General American Communications Corporation, of which he was the president and controlling shareholder. Viewtek Corp., another company Ross controlled, was to make the programs for the investors. Telefeatures, Inc., which Ross formed with Gustave Nathan in late 1981 or early 1982, was expected to distribute the videos on commission to retail stores, television stations, and cable systems throughout the world.

The 1981 GAC Video Production Program cost $226,000 per show: $176,000 for the "Rights Acquisition Agreement" and $50,000 for the "Production Facilities Agreement." At closing, each investor was to pay $20,000 to GAC, which included a $2,000 commission, and to execute a "Production Note" for $208,000 payable February 1, 1999. To secure payment of the Production Note, each investor also was to execute two short-term notes, the first for $15,000 payable on April 1, 1982, and the second for $10,000 payable on April 1, 1983.

The Program called for GAC to deposit the funds used to satisfy the short-term or "Security" notes in an interest-bearing account that would be used to retire the Production Note at maturity. GAC was also to deliver to each investor by December 30, 1981, "two (2) high band color master tapes, two (2) color protection tapes, and music cue sheets, all of which shall comply with technical standards accepted in the television industry." Under the tax code, if the video programs were not in service by December 30, 1981, the investors could not claim tax credits in 1981.

James A. Rumpf, an investment broker in Dallas, Texas, heard of the 1981 GAC Video Production Program and invited Ross to make a sales presentation in Dallas. At the presentation in November 1981, Rumpf stated "that GAC has chosen our firm to market their firm in Texas and Oklahoma." Rumpf, Ross, and the national director of sales for GAC, Dick Skyra, all promoted the Program enthusiastically, representing that a "conservative," "realistic projection" of the revenues from sales to cable companies alone over five years "would be a hundred thousand dollars" for

each half-hour program. They also represented that income would continue during the lifetimes of the investors and their children; that GAC would provide legal counsel to the investors should the IRS challenge the Program's value and the investors' credits and deductions; and that the video programs would be in service by December 30, 1981, because GAC could produce the video programs in seven to fifteen days. Rumpf and his associate, Russ Chaisson, made similar representations in later sales presentations to investors who did not attend the meeting with Ross.

In 1981, Dianne Fletcher, James Purdy, John Sammons III, Eric Hohn, H.H. Shepherd, and Billy Jean Hooks, all residents of Dallas, bought one Program each, and Howard Reser, also a Dallas resident, bought two Programs. By December 30, 1981, none of the investors had received the video programs, although GAC claimed the programs were aired at its expense over a Long Island cable system. On January 29, 1982, GAC sent the investors a letter saying that they would soon view Felix the Cat on a completed video cassette that would be delivered during the week of March 1. GAC did not send completed videos, but instead on March 10, 1982, sent another letter saying that the investors would receive "an off-line edited version of Felix programs" in the next several days.

In late March 1982, the investors received a video cassette tape that GAC described as a "rough working cut." The investors were disappointed because the videos contained almost no animation, took place almost entirely inside Felix's "clubhouse," and contained little or none of the material they expected from the program descriptions in GAC's catalog. The investors nevertheless paid the 1982 Security Note due April 1. GAC and Telefeatures continued to assure the investors that the

video programs were progressing and being well-received in the marketplace. Nonetheless, GAC never delivered final masters of the quality television required, nor did it remit to the investors revenues from the distribution of the video programs.[1]

In 1983, the investors paid GAC for the 1983 Security Notes under restrictive endorsements allowing GAC to cash the checks only if GAC delivered to the investors the final, edited master tapes of the video programs. GAC returned the checks and accelerated the Production Notes.

### B

Ross and GAC filed suit in the Southern District of New York on May 5, 1983, seeking to collect on the accelerated Production Notes. The investors filed suit in the Northern District of Texas on May 5, 1983, against Ross, GAC, Telefeatures, and others[2] alleging securities fraud, breach of contract, common-law fraud, and violations of the Texas Deceptive Trade Practices Act. The investors raised the same claims in defense to the action in New York.

On June 13, 1984, the New York suits and the Texas suits were consolidated in the Northern District of Texas, with the investors designated as the plaintiffs and Ross, GAC, and Telefeatures as the defendants. The judge submitted all claims to the jury, instructing it not to worry about double recovery if it found liability under more than one theory, for "it would be the Court's job to take your answers and ensure that plaintiffs receive only one recovery of actual damages."

The jury found that GAC and Ross had violated Rule 10b–5 and awarded damages of $35,236.08 per Program; that GAC breached its contract to provide legal services and to account for the security account, but that Telefeatures did not breach

---

1. After this suit commenced the investors each received a check for $51.42. Hohn tried to cash the check, but it was returned for lack of sufficient funds.

2. Defendants also included Viewtek Corp., First Performance Television Corp., Gustave Nathan,

and Robson & Miller, the law firm that authored the tax opinion letter in the Program memorandum and description. Jack Nottingham, whose name is in the style of this case, was originally a plaintiff, but settled with GAC and Ross before trial.

the Distribution Agreement, and awarded damages of $15,000 per Program;[3] that Ross and GAC did not commit common-law fraud; that GAC and Ross violated the DTPA, and awarded the investors damages of $65,000 per Program and $35,000 per investor for mental anguish; that GAC and Telefeatures were Ross's alter egos; and that there was a failure of consideration for the investors' promissory notes.

The district court entered judgment awarding damages of $65,000 per Program under the DTPA and of $2,000 per plaintiff under the DTPA doubling statute, Tex.Bus. & Comm.Code § 17.50(b)(1), awarding prejudgment interest and attorneys' fees, and rescinding the 1983 Security Notes and the Production Notes. Ross and GAC appeal.

## II

GAC argues that the verdict resulted from the improper admission of hearsay evidence about the value of the Program and from the local prejudice that plaintiffs' counsel aroused.

### A

[redacted] The district court permitted two plaintiffs to testify that the IRS had valued their Programs at zero and therefore had denied their deductions and credits. The district court relied on Fed.R.Evid. 803(24), which provides an exception to the hearsay rule and is based on a balancing of need and trustworthiness. *See Herdman v. Smith,* 707 F.2d 839, 842 (5th Cir.1983). The court apparently believed the testimony was necessary because it was material to the falsity of GAC's representations about the Program's tax benefits and because it was less distracting or prejudicial than testimony of an IRS evaluator, whom the court did not permit to testify. The court also viewed the evidence as trustworthy, for GAC was able to cross-examine the witness, Fletcher, to attempt to show that the valuation was based on her failure to follow the recommended accounting treatment in the Program and not based on the lack of value of the Program itself. Whatever the merits of the district court's analysis of Fed.R.Evid. 803(24), the admission of the testimony was harmless because GAC itself elicited testimony from David Conner, an investor not party to the suit, that the IRS had not allowed his deductions and had called the program a "sham." In addition, the jury heard and viewed much other evidence, including proof of GAC's failure to complete the tapes or distribute revenues, that established a low value for the Program.

### B

[redacted] GAC also argues that plaintiff's counsel inflamed local prejudice. Once in over forty-eight minutes of closing argument, plaintiffs' counsel stated that punitive damages should be awarded "to deter GAC and Stuart Ross from coming down here and making these kinds of representations and misleading investors ever again." In eleven minutes of summation, plaintiffs' counsel stated once that "Mr. Ross came down here," stated once that "Mr. Keiter goes up in November," and asked for punitive damages "to send a message to Mr. Ross, to people like him, ... to keep them from coming down here and preying upon people like this.... I want you to say something to people like this: Stop these fraudulent activities, we have had enough of them ... in Dallas or anywhere else." Contrary to GAC's assertion, these scattered remarks did not appeal to local prejudice against New Yorkers nor sway the jury, as is shown by the jury's decision *not* to award punitive damages.

## III

GAC argues that the district court erred in denying GAC's motion for judgment n.o.v. or for a new trial.

### A

[redacted] A party may move for judgment n.o.v. only on grounds previously asserted in a motion for directed verdict, for the

3. The jury awarded $20,000 to Reser, who had purchased two Programs.

motion for judgment n.o.v. is merely the renewal of the motion for directed verdict. *Jones v. Benefit Trust Life Insurance Co.*, 800 F.2d 1397, 1401 (5th Cir.1986); Fed.R. Civ.P. 50(b). GAC moved for directed verdict on two grounds: (1) the Program was not a security, and (2) plaintiffs had not established claims against Telefeatures and Nathan. Nathan was voluntarily dismissed from the suit, and the jury did not find liability against Telefeatures; thus, the second ground is no longer relevant to the case. The judge submitted the securities claims to the jury, and the jury awarded damages under those claims. Nevertheless, the district court did not enter judgment on the securities claims; thus, the first ground is no longer relevant to this case.[4]

## B

█ GAC argues that the district court confused the jury by submitting to it inconsistent theories of relief under the securities claims and the DTPA claims. GAC correctly points out that a security is neither a good nor a service under the DTPA, Tex.Bus. & Comm.Code Ann. § 17.45. *See Portland Savings & Loan Association v. Bevill, Bresler & Schulman Government Securities, Inc.*, 619 S.W.2d 241, 245 (Tex. Civ.App.—Corpus Christi 1981, no writ). GAC incorrectly argues, however, that the characterization of the Program as a security prevents recovery under the DTPA. As we recently explained in *Federal Deposit Insurance Corporation v. Munn*, 804 F.2d 860, 865 (5th Cir.1986), services related to the sale of a security may be services covered by the DTPA when they also are objectives of the transaction. The contract for legal services, the Production Facilities Agreement, and the Distribution Agreement, among others, were plainly for services that were objectives of the transaction in this case. It was not error to submit both claims to the jury.

## C

█ GAC argues that the district court confused the jury by providing contradictory definitions of "actual damages" to the jury. GAC may not raise this issue on appeal because it failed to object to the instructions before the jury retired to consider its verdict. Fed.R.Civ.P. 51. Limited review is available, however, to ensure that the instructions did not lead to an incorrect verdict that is manifestly unjust. *See Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 536, 538 (5th Cir.1984), *modified*, 754 F.2d 539 (5th Cir.1985). Here no such injustice occurred. Although the phrase "actual damages" was given varying definitions, each applied to a separate claim and each was a proper instruction on damages recoverable under that claim. Although different amounts of damages were awarded for each claim, the differences were not the product of confusion but of the jury's conscientious obedience to the court's proper instructions.

## D

█ GAC argues that retrial should be granted because the plaintiffs' damages were unliquidated: the ultimate deductions the IRS will allow is unknown. In *Randall v. Loftsgaarden*, —— U.S. ——, 106 S.Ct. 3143, 3155, 92 L.Ed.2d 525 (1986), the Supreme Court held that the recovery a defrauded tax shelter investor receives under § 12(2) of the Securities Act of 1933 or § 10(b) of the Securities Exchange Act of 1934 may not be reduced by any tax benefits the investor received from the investment. If tax benefits cannot reduce the damages under the strict "out-of-pocket" measure applied in the securities laws, *Randall*, 106 S.Ct. at 3153, we are persuaded that Texas courts would not use tax benefits to reduce recovery under the Texas DTPA, which permits plaintiffs to recover the "greatest amount" of actual damages, *Woo v. Great Southwestern Acceptance Corp.*, 565 S.W.2d 290, 298 (Tex.Civ. App.—Waco 1978, writ ref'd n.r.e.). The

---

4. Consequently, we need not address GAC's contention that the Program is not a security be-

cause the investors retained ultimate control and did not enter a common enterprise.

relevant damages were not unliquidated in this case.

### IV

GAC argues that the jury verdict is "fatally flawed" because the jury's calculations of damages are contradictory and not supported by the evidence. The jury's damage calculations are not contradictory. As we have already noted, the different awards for each claim reflect different measures of damages and different causes of injury.

█ The awards are also supported by the evidence. The jury awarded $35,236.08 per Program for violations of Rule 10b–5. The award was based on the evidence of the $20,000 down payment, the $15,000 1982 Security Note that was paid, and interest paid on the note, less whatever revenues the investors received from the Program. We find no error in this determination of "out-of-pocket" damages.

█ The jury awarded $15,000 to each investor for breach of contract, except for Reser, to whom the jury awarded $20,-000. The breach of contract claim treated only the failure to provide legal services for tax challenges and accounting services for the security account; therefore the award need not agree with either the securities or DTPA awards, which dealt with damages from other problems with the Program. Nor need Reser's recovery be exactly double that of the others to be consistent: his legal costs in defending two Programs before the IRS are not necessarily twice the costs of defending one alone.[5]

█ Finally, the jury awarded damages of $65,000 per Program for the DTPA violations. According to the instructions, the amount was expectation damages: the difference between the value of the Program as delivered and as promised. The evidence allowed the jury to determine that the value of the Program as delivered was zero: Fletcher, Hohn and Conner testified the IRS valued the Program at zero; various witnesses testified that they never received the tapes they were promised; and witnesses and the unfinished tapes shown to the jury indicated the tapes were not marketable as the contract provided. The evidence also allowed the jury to determine that the value of the program as promised was over $65,000: Ross stated that a conservative projection of revenues from the video tapes over five years was $100,000; several plaintiffs testified that the defendants told them that in the "worst case" the Programs would be valued at $100,000; and Sammons testified that he was told the Programs would generate up to $371,700 in income over seven years. The award of $65,000 per Program is therefore well within the range of awards supported by the evidence.[6]

### V

█ GAC argues that the award of damages in addition to rescission of the 1983 Security Note and the Production Note was improper. However, Texas courts permit DTPA plaintiffs to recover both damages and rescission of future obligations in order to compensate plaintiffs for the full damages caused by deceptive trade practices. *See Whirlpool Corp. v. Texical, Inc.*, 649 S.W.2d 55, 57 (Tex.App. —Corpus Christi 1982, no writ). By the terms of the DTPA itself, the award of damages under the DTPA is "not exclusive" of, but "in addition to," any other remedies provided by law. Tex.Bus. & Comm.Code Ann. § 17.43.

In this case, GAC sued on the Production Note, and the investors raised failure of consideration as their affirmative defense.

---

5. Although the amounts awarded may be speculative and higher than the costs established in the evidence, this asserted error is harmless because the district court did not enter judgment on this count.

6. The evidence also allows the jury to determine the various corporations were Ross's alter egos, that Rumpf and Chaisson were GAC's and Ross's agents, and that Ross was therefore personally liable. Since the DTPA does not require willful fraud for liability, the jury's finding of no willful fraud is not inconsistent with the award.

The investors also sued GAC alleging DTPA violations. As in *Whirlpool,* the jury found for the investors on both claims and the judge properly entered judgment awarding damages and rescinding the notes. Implicit in the district court's ruling is that the Rights Acquisition Agreement was rescinded also.[7] Thus, GAC retains the rights to the master tapes—if any exist—and the investors' recovery is not excessive. *See Whirlpool,* 649 S.W.2d at 57.

## VI

■ GAC argues that attorneys' fees were not authorized or should not be awarded because the investors failed to allocate the fees among the claims. The DTPA § 17.50(d) requires prevailing DTPA consumers to be awarded court costs and reasonable fees. Texas law also allows recovery of attorneys' fees for claims for "an oral or written contract." Tex.Rev. Civ.Stat.Ann. art. 2226 (current version at Tex.Civ.Prac. & Rem.Code § 38.001(8)). Both provisions allow recovery of attorneys' fees in this case, for investors are prevailing DTPA consumers who sued on a written contract.

■ Nor should the district court have allocated fees among the claims in this case. Fees need not be allocated when the matters entailed in the claims and counterclaims are intertwined, arise from the same transaction, and require essentially the same facts to prosecute the claims and defend the counterclaims. *See Veale v. Rose,* 657 S.W.2d 834, 841 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). In this case, essentially the same facts formed the basis of the securities, breach of contract, and DTPA claims and failure of consideration affirmative defense. While the DTPA claim was added just before trial, the attorneys' efforts already expended on the case

were necessary to successfully prosecute the DTPA claim and therefore should not be segregated. The district court properly considered all relevant factors and properly awarded attorneys' fees.[8]

## VII

■ Finally, GAC argues that the case should be dismissed for failure to join an indispensable party, James Rumpf. Fed.R. Civ.P. 19(a) requires joinder of a person if: (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

GAC has not established that it may be subject to multiple or inconsistent obligations if Rumpf is not joined, nor has it established that the disposition of this case will impair or impede any interest Rumpf may have.

■ Moreover, it is well-established that Rule 19 does not require the joinder of joint tortfeasors. *See Herpich v. Wallace,* 430 F.2d 792, 817 (5th Cir.1980). Nor does it require joinder of principal and agent. *See Milligan v. Anderson,* 522 F.2d 1202, 1204–05 (10th Cir.1975); 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1623 (1986). Finally, Rule 19 does not require joinder of persons against whom Ross and GAC have a claim for contribution. *See Dunlop v. Beloit College,* 411 F.Supp. 398, 403 (W.D.Wis.1976); Wright, Miller & Kane, *supra* at § 1623.

---

7. We reject GAC's argument that only $50,000 of the Note should be rescinded, for the Rights Agreement is valueless to the investors without the Production Facilities Agreement. We also reject GAC's argument that rescission was not timely sought; the investors pleaded for rescission in their original complaint, which was filed with reasonable dispatch when investors realized that GAC had no intent to fulfill its

contract obligations and in fact was accelerating the Notes.

8. GAC's challenge to the award of prejudgment interest is meritless. Plaintiffs had not profited on their investment at the date of trial. *See Randall v. Loftsgaarden,* 106 S.Ct. at 3155.

Thus, whether Rumpf be a joint tortfeasor, agent, or contributor to the award, Rumpf was not an indispensible party to this case.[9]

## VIII

The decision of the district court is AFFIRMED.

9. Nor are we persuaded that Rumpf was not joined in order to create diversity jurisdiction. The district court had federal question jurisdiction in any event under 28 U.S.C. § 1331 and 15 U.S.C. §§ 78j & 78aa. GAC's argument that we should infer anything favorable to GAC and Ross from Rumpf's absence as a witness is also frivolous, for Rumpf was equally accessible to both parties. *See United States v. Chapman,* 435 F.2d 1245, 1247 (5th Cir.1970).