**Thomas R. HARGROVE, Susan Hargrove, Miles Hargrove, T. Geddie Hargrove, Raford Hargrove, and Raford Hargrove as Attorney in Fact for Thomas Hargrove**

v.

**UNDERWRITERS AT LLOYD'S, LONDON, Professional Indemnity, Agency, Inc., and Corporate Risk International.**

**No. Civil Action G–95–674.**

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 21, 1996.

Francis I. Spagnoletti, Spagnoletti & Assoc., Houston, TX, Richard Lee Melancon, Friendswood, TX, for plaintiffs.

E. Stratton Horres, Jr., Wilson Elser et al., Dallas, TX, for defendants.

## ORDER

KENT, District Judge.

Plaintiff Thomas Hargrove, an employee of Centro Internacional de Agricultura Tropical d/b/a CIAT (CIAT), was kidnapped in Colombia by FARC guerrillas. After approximately eleven months in captivity, Hargrove was released. Hargrove and certain members of his family (the Plaintiffs) filed this action against the Defendants, asserting various state law causes of action based on the Defendants' conduct in negotiating for Hargrove's release. Now before the Court are the Defendants' Motion to Dismiss [1] and the

---

1. The Court allowed the parties to engage in discovery limited to the issues raised by the Defendants in their Motion to Dismiss, and the Plaintiffs and the Defendants rely on substantial materials outside the pleadings to support their positions. Accordingly, the Court treats the Defendants' Motion as a Motion for Summary Judg-

Plaintiffs' Motion to Strike. For the reasons set forth below, the Plaintiffs' Motion to Strike is hereby **DENIED,** and the Defendants' Motion to Dismiss is hereby **GRANTED IN PART** and **DENIED IN PART.**

## I. FACTUAL BACKGROUND

CIAT is an international organization founded by the World Bank and the United Nations Development Programme on behalf of the Consultive Group on International Agricultural Research, a group of national governments, multi-cultural aid agencies, private foundations, and others. CIAT was founded for the purpose of improving and increasing agriculture production throughout the developing world, and operates to promote agricultural research for the benefit of developing countries. CIAT was originally established in Colombia in 1967, and is recognized as a legal person by the Colombian government.

CIAT maintained a "kidnap and ransom" insurance policy (the Policy) that covered losses arising from the kidnapping of certain employees and the expenses associated with negotiating their release. The Policy was issued by Professional Indemnity Agency, Inc. (PIA) on behalf of the Underwriters at Lloyd's, London (Underwriters). To avoid the appearance that the Underwriters placed their economic interest over the interests of a hostage, the Policy provides that the Underwriters will not be involved in the day-to-day handling of any kidnapping and will not make any substantive decisions regarding strategy or the payment of ransom. Instead, the Policy provides that in the event of a kidnapping, Corporate Risk International (CRI), a crisis management company, will advise and assist CIAT in the negotiations for the release of the hostage.

In 1991, CIAT hired Hargrove as public affairs officer. While Hargrove was born in and grew up in Texas, he lived and worked in the Philippines immediately prior to going to work for CIAT. In 1992, Hargrove and his wife and children moved to Cali, Colombia, in connection with his position with CIAT. On September 23, 1994, while on his way to work, Hargrove was kidnapped by members of FARC, a guerrilla group that has been the subject of a long-term campaign by the Colombian government. Because of the involvement of the FARC, any action taken by CIAT or the Hargrove family in connection with the kidnapping required coordination with high-level Colombian officials, including the Minister of Foreign Relations, the Minister of Government, the Minister of Defense, and the High Commissioner for Peace.

In October or November 1994, the kidnappers made a demand seeking $6,000,000 ransom for Hargrove's release. After consulting with experts in the Colombian government and CRI's crisis management team, CIAT adopted a public position refusing to pay ransom. This position was grounded, in part, on a fear of further kidnappings if ransom were paid. Moreover, under Colombian law, it is illegal, under certain circumstances, to pay ransom. CIAT believed the most prudent course to obtaining a safe and early release of Hargrove was to inform the kidnappers of CIAT's mission of improving the lives of Colombians by increasing agriculture production, and to portray CIAT as a publicly-funded non-profit institution that could ill afford to pay ransom. CIAT's efforts to obtain Hargrove's release included working with officials of the Colombian government, seeking to establish communication with the kidnappers, and enlisting the support of local and national groups, including the news media, to put public pressure public on the kidnappers.

At this point in the story, the parties' version of events diverge. According to the Defendants, the Hargrove family was not satisfied with CIAT's efforts, and they informed CIAT that they would offer to pay ransom. Although CIAT attempted to dissuade the family from undertaking such action, the family nonetheless set up lines of communication with the kidnappers and made it known that they were willing to pay ransom. While CIAT disagreed with the family's strategy, it had no choice but to cooperate with the family, and it worked with the family during the negotiation process. Consequently, CIAT involved the Colombian

ment rather than a Motion to Dismiss. *See* Fed. R.Civ.Pro. 12(c).

authorities in the family's preparation to pay ransom to obtain Hargrove's release, resulting in many sensitive and confidential discussions between CIAT and various governmental officials. CIAT eventually helped the Hargrove family to arrange for ransom payments to secure Hargrove's release.

The Plaintiffs, however, contend that because the Defendants flatly refused to negotiate with FARC, the kidnappers contacted Hargrove's wife and demanded that she negotiate with them, or they would not even let her have Hargrove's cadaver. Because the Hargrove family could not arrange for a ransom payment on their own, the family enlisted the aid of an attorney, who made demand on PIA and CIAT to fully disclose the terms and conditions of any insurance policy that might be applicable. The Plaintiffs contend they were the only people actively seeking Hargrove's release.

As a result of the negotiations with the FARC kidnappers, whether the negotiations were the efforts of the Hargrove family or the Defendants, a ransom payment was made in May 1995, and a second payment was made in August 1995. Hargrove was finally released on or about August 22, 1995.

In October 1995, the Plaintiffs filed this action. According to the Plaintiffs, "it is common knowledge that terrorists are usually satisfied with 10–15% of the original ransom demand." Amended Complaint, section V, paragraph 4. Thus, the Plaintiffs' theory of the case is that if the Defendants had immediately begun negotiating with the kidnappers to pay a portion of the ransom demand, Hargrove would have been released much sooner. The Plaintiffs seek $25,000,000 in actual damages, and $75,000,000 in punitive damages.

In their Amended Complaint, the Plaintiffs contend the Underwriters and PIA were negligent and breached their duty to the Plaintiffs "to prudently and reasonably negotiate" with the FARC guerrillas for Hargrove's release. The Plaintiffs further contend they are third party beneficiaries of the Policy, and that, by failing to reasonably negotiate for Hargrove's release and failing to provide the funds available under the Policy, the Underwriters breached their obligations under the Policy. The Plaintiffs also assert that the Underwriters and PIA made certain unspecified negligent and intentional misrepresentations that had the effect of prolonging Hargrove's captivity. Finally, the Plaintiffs contend that the Underwriters breached their common law duty of good faith and fair dealing by failing to adequately investigate the Plaintiffs' claim, by failing to make the Policy funds available to secure the Hargrove's release, by employing false and deceptive practices in the processing of the Plaintiffs' claims, and by negligently training or failing to train their employees in the proper handling of kidnappings. *See* Amended Complaint, section VI, paragraphs 1–2.

In their claims against CRI, the Plaintiffs contend that CRI "failed to act reasonably and prudently under the circumstances, and was negligent in its negotiations to secure the release" of Hargrove. Amended Complaint, section VI, paragraph 3. The Plaintiffs further contend that CRI entered into a conspiracy with the other Defendants "to provide false and misleading information to the Hargrove family resulting in an extreme protraction of Thomas Hargrove's captivity by FARC rebels." *Id.*[2]

## II. THE ANTI–ABDUCTION ACT

In Colombia, abductions for ransom are literally everyday occurrences—1717 abductions, or approximately 5 per day, occurred in 1991, while 1320 abductions, or almost 4 per day, occurred in 1992. *See* Translation of Judgment 542/93 of the Republic of Colombia Constitutional Court at 46 (Vladimiro Naranjo–Mesa, J., dissenting in part); *see also Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1278 (S.D.N.Y.1980) (kidnappings for ransom in Colombia are "a form of fund raising" and are "virtually day to day news"). As a result of extreme public pressure to reduce the numbers of abductions,

---

**2.** Initially, the Plaintiffs also included CIAT and Kramer as Defendants in the case. However, on August 19, 1996, the Plaintiffs filed a Notice of Dismissal of their claims against CIAT and Kramer.

the Colombia legislature passed the Anti–Abduction Act, Act 40 of 1993. Based on the consideration of the experiences of other countries, the Colombian Congress concluded that the most effective means to combat abductions is to increase the penalties for abduction and kidnapping, and to prevent the negotiation for the payment of ransom. Accordingly, Act 40 establishes harsh sentences for those who commit the offense of abduction, and prohibits the negotiation or payment of ransom. *See* Affidavit of Felipe Ayerbe Munoz, Exhibit F to Defendants' Reply Brief.

Under the Act, any person who, "knowing that money is going to be destined to pay a ransom for the release of an abducted individual, participates in the transaction thereof," is considered to have aided and abetted the kidnapper, and faces up to five years in prison. *See* Act 40, article 7, paragraph 2. Article 12 of the Act provides that "[w]hoever participates in an insurance contract the purpose of which is to guarantee payment of a ransom in possible abduction cases, or *who participates in the negotiation or intermediation of the ransom demanded thereof,*" faces up to two years in prison. *See* Act 40, article 12 (emphasis added). The Act declares insurance contracts intended to cover the risk of payment of ransom to be null and void. *Id.,* article 26.

Finally, article 25 of Act 40 provides that, "[w]ithout prejudice to the application of all other pertinent sanctions, whenever an officer or agent of a foreign or domestic corporation hides the fact of or aids in the payment of the ransom for the release of an abducted officer or employee of said company, or one of its affiliates, the government shall be empowered to declare voidable all contracts entered into by and between said company and any government agency."

In 1993 and 1994, the Colombia Constitutional Court considered the constitutionality of Act 40 of 1993. *See* Judgment No. 542/93, issued November 24, 1993; and Judgment No. 213/94, issued April 28, 1994. As will be discussed below, the Court declared portions of the Act to be enforceable, other portions to be "conditionally enforceable," and still others to be completely unenforceable.

## III. MOTION TO DISMISS

The Defendants move to dismiss the Plaintiffs' claims on several grounds, including lack of subject matter jurisdiction by virtue of the operation of the "act of state doctrine," lack of personal jurisdiction, and improper venue.[3]

### A. The Act of State Doctrine

■ The act of state doctrine is a "judge-made prudential rule that prevents United States courts from sitting in judgment on the official acts of foreign sovereigns." Gregory H. Fox, *Reexamining the Act of State Doctrine: An Integrated Conflicts Analysis,* 33 Harv.Int'l L.J. 521, 521 (1992). In *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), the United States Supreme Court described the doctrine:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* at 252, 18 S.Ct. at 84; *see also Restatement (Second) of Foreign Relations Law* § 41 ("a court in the United States ... will refrain from examining the validity of an act by a foreign state by which that state has exercised its jurisdiction to give effect to its public interest."). The act of state doctrine springs from notions of international comity and separation of powers—that is, "respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 408, 110 S.Ct. 701, 706, 107 L.Ed.2d 816 (1990). The focus of an act of state analysis should be on "preventing

---

3. At the time this Motion was filed, CIAT and Kramer were still Defendants in the action. Because they are no longer Defendants, the Court will not address those portions of the Motion devoted solely to CIAT and/or Kramer.

friction with coequal sovereigns." *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1113 (5th Cir.1985). Thus, even in cases where

> the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, we nevertheless decline to decide the merits of the case if in so doing we would need to judge the validity of public acts of a sovereign state performed within its own territory.

*Id.; see also Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964).

■ A conclusion that the act of state doctrine is applicable to the case, however, does not divest this Court of subject matter jurisdiction over the action; instead, the act of state doctrine operates as a super choice-of-law rule, requiring a court to apply the law of the foreign state as the rule of decision when faced with challenges to the official acts of a sovereign government. *Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. at 705 ("The act of state doctrine is not some vague doctrine of abstention but a *'principle of decision* binding on federal and state courts alike.'") (emphasis original); *Ricaud v. American Metal Co., Ltd.,* 246 U.S. 304, 309, 38 S.Ct. 312, 313, 62 L.Ed. 733 (1918) (act of state doctrine requires court to accept the validity of an act of a foreign sovereign within its own territory, but does not deprive the court of jurisdiction over the matter—"[t]o accept a ruling authority and to decide accordingly is not a surrender or abandonment of jurisdiction but is an exercise of it."); *Callejo,* 764 F.2d at 1113 (under the act of state doctrine, "courts exercise jurisdiction but decline to decide certain issues."). Thus, the Defendants' contention that the act of state doctrine deprives this Court of subject matter jurisdiction over the Plaintiffs' claims is clearly incorrect. However, if the Court concludes the doctrine is applicable, dismissal of the Plaintiffs'

claims may nonetheless be appropriate, if the presumed validity of the official acts "precludes the possibility of any relief for an opposing party." *Sharon v. Time, Inc.,* 599 F.Supp. 538, 546 (S.D.N.Y.1984); *see also International Assoc. of Machinists and Aerospace Workers v. Organization of the Petroleum Exporting Countries,* 649 F.2d 1354, 1361 (9th Cir.1981) (dismissing complaint "where the only remedy sought is barred by act of state considerations."); *Callejo,* 764 F.2d at 1125–26 (dismissing case where relief sought by the plaintiff was barred by the act of state doctrine).

■ The Defendants contend that because Act 40 prohibits the payment of ransom, adjudication of the Plaintiffs' claims would require this Court to judge the validity of Act 40 and to sit in judgment on the acts of the Colombian government. Accordingly, the Defendants argue that this Court must dismiss the Plaintiffs' action. The Plaintiffs, however, argue that, through the 1993 and 1994 decisions of the Colombia Constitutional Court, the portions of Act 40 prohibiting the payment of ransom were declared unconstitutional. Thus, because the payment of ransom was not prohibited under Colombian law, the act of state doctrine is inapplicable to the case at bar. The Defendants contend that the relevant portions of Act 40 remain constitutional after the Colombian court's decisions; accordingly, the act of state doctrine is applicable to the Plaintiffs' claims.[4]

As noted above, paragraph two of article 7 of Act 40 criminalizes the participation in a known "transaction" for the payment of ransom, while article 12 prohibits participation in the "negotiation or intermediation" of a ransom payment demanded in an abduction. Article 25 of Act 40 provides that, in addition to any other applicable sections, any contracts between a government agency and a

---

4. The Court does not believe that the dismissal of CIAT and Kramer as Defendants in this action has any impact on the application of the act of state doctrine in this case. The act of state doctrine is triggered by the nature and factual underpinnings of a plaintiff's claims, rather than by the identity of the particular defendant against whom the claims are asserted. *See, e.g., Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. at 705 (the act of

state doctrine applies only if a court *"must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."); *see also Callejo,* 764 F.2d at 1113. Thus, if applicable to any of the Plaintiffs' claims, the act of state doctrine would bar those claims, whether asserted against CIAT alone, or any of the Defendants jointly or individually.

foreign corporation may be voided if "an officer or agent of a foreign or domestic corporation hides the fact of or aids in the payment of the ransom for the release of an abducted officer or employee of said company, or one of its affiliates."

At the request of this Court, the parties have supplied agreed-upon translations of Judgment No. 542/93, issued on November 24, 1993 by the Constitutional Court of the Republic of Columbia, and Judgment No. 213/94, issued on April 28, 1994 by the Constitutional Court. In Judgment No. 213/95, the Constitutional Court declared paragraph two of article 7 of Act 40 to be completely unenforceable. *See* Translation of Judgment 213/94 at 33. In Judgment No. 542/93, the Colombian Court declared articles 12 and 25 of the Act to be "conditionally enforceable"— that is, enforceable "except when the agent acts under any of the circumstances of justification of the action as provided by the criminal laws, in which case, they are unenforceable." *See* Translation of Judgment 542/93 at 20. Thus, it appears that neither the Plaintiffs nor the Defendants correctly describe the effect of the decisions of the Constitutional court. Colombia law neither flatly prohibits nor absolutely permits the payment of ransom. Instead, after the decisions of the Constitutional court, payment of ransom is illegal, but those charged with the offense are entitled to attempt to establish the defense of justification.[5]

If the payment or negotiation of ransom by a corporation were flatly prohibited by Colombian law, this Court, under the analysis of the Fifth Circuit in *Callejo v. Bancomer, S.A.,* would be required to dismiss the Plaintiffs' claims based on the Defendants' failure to negotiate and pay ransom to obtain Hargrove's release. In *Callejo,* an American plaintiff, through a series of complicated transactions, purchased certificates of deposit (CDs) denominated in U.S. dollars at a Mexican bank. The CDs called for payment of principal and interest at maturity in U.S. dollars. 764 F.2d at 1105–06. However, af-

ter the plaintiff purchased the CDs, Mexico, facing a monetary crisis caused by a decline in the price of oil, enacted exchange control regulations requiring interest and principal on all U.S. dollar-denominated CDs to be paid in pesos at a specified exchange rate. *Id.* at 1106. After receiving notification that the CDs would be repaid in pesos, the plaintiff filed suit, alleging breach of contract and violations of securities laws and seeking recision of the sale of the CDs or money damages. *Id.* While the Fifth Circuit disagreed with the trial court's conclusion that it lacked jurisdiction over the plaintiff's claim under the Foreign Sovereign Immunities Act, the appellate court concluded the action could not be maintained by virtue of the act of state doctrine. 764 F.2d at 1105. The Fifth Circuit held that adjudication of the plaintiff's breach of contract claim "would necessarily call into question the Mexican regulations," because the court "could require [the bank] to honor the terms of the certificates only by disregarding the regulations." *Id.* at 1116. Awarding the plaintiff the relief he sought by enforcing the terms of the CDs "would render nugatory the attempts by Mexico to protect its foreign exchange reserves"; thus, the plaintiff's claim was barred by the act of state doctrine. *Id.* *Callejo,* therefore, can be viewed as standing for the proposition that the act of state doctrine bars recognition of a claim premised on the defendant's failure to violate the laws of a foreign country.

Accordingly, if, under Colombian law, the payment of ransom were illegal under any circumstances, it is clear that the bulk of the Plaintiffs' claims would be premised on the Defendants' failure to violate that law. Awarding the Plaintiffs relief for the Defendants' failure to immediately pay ransom would require the Court to disregard the law against ransom, and would "render nugatory" Colombia's attempts to combat terrorism and to reduce the incidence of abductions. Thus, under *Callejo,* the Plaintiffs claims

---

**5.** Under Colombian law, "justification" is a defense to criminal prosecution, similar to our defenses of self-defense or duress. A criminal act is justified "when committed out of the need for protecting a right of oneself or of another from

an imminent danger, not avoidable otherwise, which the actor did not intentionally or negligently cause, and which the individual has no legal duty to face." Translation of Judgment No. 542/93 at 15.

would clearly be barred by the act of state doctrine.

However, as noted above, the portions of Act 40 prohibiting the negotiation or payment of ransom, whether by an individual or corporation, are enforceable unless the defendant can establish the defense of justification. The question then becomes whether the fact that the Defendants might have been able to avoid being punished for what is otherwise an illegal act—the negotiation and payment of ransom—renders the act of state doctrine inapplicable. The Court concludes that it does not. After the decisions of the Constitutional court, payment of ransom remains illegal. The decisions provide that a particular defendant, under certain circumstances, may be able to avoid prosecution or conviction under the Act. The Court does not believe that the act of state doctrine becomes irrelevant simply because a defense may exist for some defendants under some circumstances.

Moreover, even if the availability of the defense of justification defeats the Defendants' act of state argument predicated on the illegality of ransom, the act of state doctrine nonetheless bars the Plaintiffs' claims based on the nature of the negotiations undertaken by the Defendants. The act of state doctrine applies only if a court "*must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Kirkpatrick,*

493 U.S. at 406, 110 S.Ct. at 705. Here, the Plaintiffs contend, in essence, that the Defendants failed to take the actions required of them, whether by the general law of negligence or by the contract of insurance. Thus, the outcome of the Plaintiffs' case turns upon the propriety and legal sufficiency of the actions taken by the Defendants—that is, the Plaintiffs can prevail on their claims only if the jury concludes that the actions taken by the Defendants were improper and inadequate under the circumstances.

The Defendants have presented evidence establishing that they consulted with high level Colombia governmental officials in planning their course of action in dealing with the FARC guerrillas and seeking Hargrove's release. The governmental officials gave CIAT specific advice as to what actions could or not be taken legally in their negotiations with the kidnappers, and specifically advised CIAT that it would be illegal for CIAT to negotiate or pay ransom. *See* Kramer Affidavit, Exhibit A to Defendants' Brief in Support of Motion to Dismiss, at paragraphs 15–20; Kramer Deposition, Exhibit A to Defendants' Reply Brief, at 251, 256–58, 263; Affidavit of Jesus A. Cuellar, Exhibit C to Defendants' Reply Brief, at paragraph 6–10; Affidavit of Robert D. Havener, Exhibit E to Defendants' Reply Brief, at paragraphs 6, 7, 10.[6] The Plaintiffs do not dispute these assertions, and have presented no evidence establishing that the level of involvement by the Colombian officials was other than alleged by

6. The Plaintiffs object to and request that this Court strike the affidavits of Felipe Ayerbe Munoz and Jesus A. Cuellar, which were filed by the Defendants in connection with their Reply to the Plaintiffs' Response to the Motion to Dismiss. The Plaintiffs contend that the affidavits should be struck because they were filed after the close of the period for limited discovery allowed by this Court. This objection is without merit. The Defendants' Motion to Dismiss was filed on January 16, 1996. The Court created the discovery window in response to the Motion, required the Plaintiffs to file a response to the Motion after the close of this limited discovery, and specifically authorized the Defendants to file a Reply. Thus, the Reply, and any evidence supporting it, would necessarily be filed after the close of the discovery window. Given that the Defendants could not know what assertions the Plaintiffs would make in their response until after the close of the discovery, they could not somehow designate to the Plaintiffs the evidence they

would rely upon in the Reply. Moreover, Munoz is an expert on Colombian law, and his affidavit simply responded to that of the Plaintiffs' own expert. In their Motion to Strike, the Plaintiffs submitted, and the Court has considered, the affidavit of another expert controverting the affidavit of Munoz. Thus, the Plaintiffs have not been prejudiced by the Defendants' use of the affidavit of Mr. Munoz. As to Cuellar, the Court notes that he is a CIAT employee who was identified by Mrs. Hargrove as having knowledge of CIAT's contacts with the Colombian government officials. Thus, the Plaintiffs can hardly complain that they had no opportunity to develop the testimony of Cuellar during the discovery window. In addition, the Court finds that the information presented in Cuellar's affidavit is not hearsay and may properly be considered in connection with the Motion to Dismiss. Accordingly, the Plaintiffs' Motion to Strike is hereby **DENIED.**

the Defendants.[7] Because the Defendants' actions were directed and approved by the Colombian government, the condemnation of the Defendants' actions that is necessary for the Plaintiffs to prevail is necessarily a condemnation of the actions and recommendations of the Colombian government. Thus, the outcome of the Plaintiffs' claims depends on a determination of the propriety of the Colombian government's decision as to the best method to combat the rash of terrorist abductions occurring in Colombia, which is precisely the inquiry prohibited by the act of state doctrine.

In *Shen v. Japan Airlines,* 918 F.Supp. 686 (S.D.N.Y.), *aff'd,* 43 F.3d 1459 (2d Cir. 1994), the plaintiffs brought an action against the Japan Immigration Bureau and Japan Airlines (JAL) for damages they allegedly sustained when they were refused entry at a Japanese airport and deported to China. The court concluded that any claims against JAL would be barred by the act of state doctrine, because the airline's actions against the plaintiffs were directed by Japanese immigration officials:

> The Plaintiffs do not dispute that these directions by Japanese officials were acts of state. Because the Court would be required to find that the acts of Japanese immigration authorities were invalid in order to find misconduct on the part of JAL, the act of state doctrine requires dismissal of the claims against JAL.

*Id.* at 691; *see also O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.,* 830 F.2d 449, 453 (2d Cir.1987) (a party may assert the act of state doctrine where its conduct has been compelled by a foreign government).

The same result is required in this case, whether or not the payment of ransom by the Defendants was illegal under Colombian law. The Plaintiffs do not dispute that the actions of the Colombian officials in connection with the Hargrove kidnapping were acts of state. Thus, the Court must presume that the actions of the Colombia government, and its directions to the Defendants about the

handling of the kidnapping, were proper and valid. *See Kirkpatrick,* 493 U.S. at 409, 110 S.Ct. at 706 (the act of state doctrine requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."); *Ricaud v. American Metal Co., Ltd.,* 246 U.S. 304, 309, 38 S.Ct. 312, 313, 62 L.Ed. 733 (1918) (the act of state doctrine requires that, "when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action *or the merit of the result* cannot be questioned but must be accepted by our courts as a rule for their decision.") (emphasis added). Because the Defendants acted in accordance with those directions, the Court must likewise presume the Defendants' actions to be valid and proper. Accordingly, any claim based on the Defendants' failure to negotiate and pay ransom cannot continue, because the operation of the act of state doctrine precludes a finding that the actions of the Colombian government officials were improper. *Shen,* 918 F.Supp. at 691. Because the presumed validity of the official acts of the Colombian officials precludes the possibility of any relief for the Plaintiffs on their claims stemming from the Defendants' conduct in negotiating for Hargrove's release, dismissal of those claims is proper. *Sharon,* 599 F.Supp. at 546.

■ However, as noted above, the Plaintiffs also assert claims of misrepresentation and breach of the duty of good faith and fair dealing. While it seems likely that these claims will be so intertwined with the other claims asserted by the Plaintiffs that the act of state doctrine will also bar their prosecution, the Complaint does not make clear the precise nature and factual predicate of these claims. Thus, the Court cannot, at this juncture, determine whether the operation of the act of state doctrine would preclude the possibility of granting the Plaintiffs any relief on these claims. Accordingly, the Court will not dismiss these claims at this juncture, but instead will allow the parties time to engage in substantive discovery to flesh out the claims. If, after discovery, it appears that no

---

7. In fact, throughout the discovery permitted by this Court, the Plaintiffs elected not to question any of the Defendants' witnesses about the extent of the governmental involvement in the negotiations.

portion of the misrepresentation or breach of duty of good faith and fair dealing claims can survive the operation of the act of state doctrine as outlined above, the claims will be disposed of by way of dispositive motion or other appropriate means.

Because a portion of the Plaintiffs' claims against the Defendants remain viable, at least for the time being, the Court must address the remaining arguments asserted by the Defendants in support of their Motion to Dismiss.

### B. Personal Jurisdiction

In their Motion to Dismiss, the Defendants argued that this Court could not exercise personal jurisdiction over CIAT, Fritz Kramer, CRI, or PIA. However, on March 29, 1996, PIA announced that it was abandoning its jurisdictional challenge,[8] and as previously noted, the Plaintiffs have dismissed their claims against CIAT and Kramer. Accordingly, CRI is now the only party challenging the Court's exercise of personal jurisdiction.

 In federal court, personal jurisdiction over a non-resident defendant is proper if: (1) the defendant is amenable to service of process under the forum state's long-arm statute; and (2) the exercise of personal jurisdiction over the defendant is consistent with due process. *Jones v. Petty–Ray Geophysical Geosource, Inc.*, 954 F.2d 1061 (5th Cir.1992). The Texas long-arm statute authorizes service of process on a non-resident defendant if the defendant "does business" in Texas. Tex.Civ.Prac. & Rem.Code Ann. § 17.042. A nonresident does business in Texas if the nonresident, *inter alia,* "commits a tort in whole or in part in [Texas]." Tex. Civ.Prac. & Rem.Code Ann. § 17.042(2). Here, because the Plaintiffs contend that CRI made misrepresentations to the Hargrove family in Texas, it is clear that CRI is amenable to service of process under the Texas long-arm statute. The question remains, however, whether the exercise of jurisdiction over CRI in this case is constitutional.

 Whether the exercise of personal jurisdiction over a non-resident defendant is consistent with the due process clause of the United States Constitution involves a two-pronged inquiry. First, the Court must conclude that the defendant has "minimum contacts" with Texas. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Second, the Court must also conclude that requiring the defendant to litigate in Texas does not offend "traditional notions of fair play and substantial justice." *Id.; see also Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir.), *cert. denied,* ─── U.S. ───, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994); *Ruston Gas Turbines Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir.1993). When considering the Motion to Dismiss, this Court must resolve any factual disputes in the Plaintiffs' favor and treat any uncontroverted allegations in their Complaint as true. *Wilson*, 20 F.3d at 648. However, to invoke this Court's jurisdiction, the Plaintiffs must present facts that establish at least a prima facie case that personal jurisdiction over CRI is proper. *Id.*

### (1) Minimum Contacts

██ The minimum contacts aspect of due process is divided into two types of personal jurisdiction—specific and general. *Wilson*, 20 F.3d at 647. If the cause of action arises from particular activities of the defendant in the forum, specific jurisdiction is generally involved. The minimum contacts analysis in cases of specific jurisdiction is narrow, focusing on the relationship between the defendant, the cause of action, and the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). If the cause of action is not based on the defendant's specific activities in the forum state, general jurisdiction is typically involved. In the case at bar, the Court concludes that general jurisdiction exists over CRI, and the Court therefore does not address the question of specific jurisdiction.

---

**8.** *See* Transcript of Discussion between Attorneys, Exhibit DD to Plaintiffs' Response to Defendants' Motion to Dismiss, at 3.

■ In order to exercise general personal jurisdiction over a non-resident defendant, the defendant's contacts with the forum state must be both "continuous and systematic," and "substantial." *Wilson,* 20 F.3d at 647, 650–51; *Helicopteros,* 466 U.S. at 417–19, 104 S.Ct. at 1873–75. Viewing the evidence in the light most favorable to the Plaintiffs, the Court is satisfied that CRI has substantial, continuous, and systematic contacts with the state of Texas.

■ The evidence presented by the Plaintiffs establishes that CRI is the exclusive agent for crisis management on all of the kidnap and ransom insurance policies issued by PIA, over four hundred of which were sold in Texas. *See* Van Wagenen Deposition, Exhibit K to Plaintiffs' Response to Defendants' Motion to Dismiss, at 31–32, 141–43; McWeeney Deposition, Exhibit J to Plaintiffs' Response, at 14–15. CRI has made marketing trips to Texas with PIA and regularly sends international security update newsletters to clients in Texas. *See* Van Wagenen Deposition at 147–51, 160; McWeeney Deposition at 21, 24–26, 47–48, 130, 137–38; Tusa Deposition, Exhibit P to Plaintiffs' Response, at 18, 21, 28; Besse Deposition, Exhibit O to Plaintiffs' Response, at 19, 24. In addition, CRI has been hired by Texas companies to perform security investigations and provide reports about international conditions. *See* Budd Deposition, Exhibit M to Plaintiffs' Response, at 30–33; Tusa Deposition at 15–16, 21; Besse Deposition at 30.

■ Much of the evidence mentioned above was obtained by the Plaintiffs through discovery of third parties, including many clients of CRI. During the course of discovery in this action, Sean McWeeney, president of CRI, was issued a subpoena duces tecum requiring him to produce documents involving CRI business transactions in Texas or with Texas companies. However, McWeeney produced no such documents, explaining at his deposition that the files involving Texas transactions were mysteriously "misplaced." *See* McWeeney Deposition at 116–30, 141, 148–49, 162, 167. A reasonable inference that can be drawn from this coincidental disappearance of the Texas files is that the missing files contain more evidence of CRI's substantial contacts with Texas. Therefore, considering the evidence produced by the Plaintiff as well the evidence misplaced by CRI, the Court concludes that CRI's contacts with Texas are sufficiently substantial, continuous, and systematic to support the exercise of general personal jurisdiction over CRI.

### (2) Fair Play and Substantial Justice

In addition to requiring minimum contacts with the forum state, due process requires that the exercise of personal jurisdiction over a non-resident defendant comply with "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158; *Wilson,* 20 F.3d at 647. The relationship between the defendant and the forum state must be such that it is reasonable to require the corporation to defend the particular suit. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).

■ The fairness prong of the jurisdictional inquiry requires the Court to consider the burden on the defendant, the forum state's interest in resolving the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564. "It is incumbent upon the defendant to present a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Jones v. Petty–Ray Geophysical Geosource, Inc.,* 954 F.2d 1061, 1068 (5th Cir.1992).

Given CRI's substantial and continuous presence in Texas, the Court concludes that, under the circumstances of this case, exercising jurisdiction over CRI is consistent with traditional notions of fair play and substantial justice. First, being forced to defend against the Plaintiffs' claims in Texas will not be unduly burdensome to CRI, given

that CRI has many Texas clients and has made many business trips to Texas. Moreover, the Plaintiffs in this case are Texas residents; thus, Texas has a legitimate and significant interest in this dispute. Finally, proceeding with the trial in this Court will provide the Plaintiff with an efficient and convenient means of resolving the case. Given the Defendant's presence in and its regular trips to Texas, conducting the trial in Texas should provide, overall, the most convenient and efficient resolution of the case. Therefore, after considering all the relevant circumstances, the Court concludes that the exercise of personal jurisdiction over CRI does not offend traditional notions of fair play and substantial justice.

### C. Improper Venue

In their Motion to Dismiss, the Defendants also argued that this action must be dismissed because venue is improper in this Court. However, this argument is predicated upon a finding that the Court lacked jurisdiction over a least one of the Defendants, and upon a version of the venue statute that was amended on October 3, 1995. Prior to its amendment, 28 U.S.C.A. § 1391(a)(3) provided that, in a case where jurisdiction is based solely on diversity of citizenship, venue is proper in a "judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." Therefore, because the Defendants contended personal jurisdiction did not exist over CIAT, Kramer, or CRI, the Defendants argued that venue in this District was improper.

However, after the amendment, section 1391(a)(3) authorizes venue in an action founded on diversity of citizenship in "a judicial district in which *any defendant* is subject to personal jurisdiction at the time the action

is commenced, if there is no district in which the action may otherwise be brought." 28 U.S.C.A. § 1391(a)(3) (Supp.1996) (emphasis added). Because the Court has concluded that it has personal jurisdiction over the only Defendant now raising a jurisdictional challenge, venue is proper under both the current and previous versions of 28 U.S.C.A. § 1391(a)(3).

### D. Failure to Join Necessary Parties

Proceeding on the assumption that the Plaintiffs' claims against all other Defendants would be dismissed, the Defendants also argued in their Motion that the claims against the Underwriters must be dismissed for failure to join parties necessary for just adjudication, pursuant to Rule 19 of the Federal Rules of Civil Procedure. Under the terms of the Policy, the Underwriters had no direct involvement in the negotiation for Hargrove's release. Thus, the Underwriters argued that to proceed against them in the absence of the other Defendants would severely prejudice their rights, "because they would be unable to pursue available avenues of relief or achieve meaningful discovery." Brief in Support of Motion to Dismiss at 22. However, because PIA and CRI remain Defendants in this action, the factual predicate of the Underwriters' Rule 19 argument is not satisfied, and, therefore, the argument fails.[9]

## IV. SUMMARY

In summary, the Court concludes that the act of state doctrine precludes the granting of any relief to the Plaintiffs on their claims based on the Defendants' failure to properly negotiate for Hargrove's release and their failure to pay ransom. Therefore, as to those claims, the Defendants' Motion to Dismiss is hereby **GRANTED,** and all such claims asserted by the Plaintiffs are hereby **DISMISSED.** However, the Court cannot now determine whether the Plaintiffs' mis-

---

9. The absence of CIAT and Kramer from the litigation has no effect on the viability of the Plaintiffs' claims against the remaining Defendants. Generally, there is no requirement that all parties to a contract be joined in an action brought by a third-party beneficiary. *See* Wright, Miller & Kane, *Federal Practice & Procedure: Civil* § 1613 (1986). To the extent the Plaintiffs have valid claims of misrepresentation or breach

of duty of good faith and fair dealing against the Defendants, Rule 19 does not require the joinder of joint tortfeasors. *Nottingham v. General American Communications Corp.,* 811 F.2d 873, 880 (5th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987). Nor does Rule 19 require the joinder of principal and agent, or parties against whom a defendant may have a claim for contribution. *Id.*

608

representation and breach of duty of good faith and fair dealing claims should likewise be barred by the act of state doctrine; therefore, as to those claims asserted against the Defendants, the Motion to Dismiss is hereby **DENIED.** In addition, because the Court concludes that the exercise of personal jurisdiction over Defendant CRI is proper, that portion of the Defendants' Motion to Dismiss is hereby **DENIED.** All remaining portions of the Defendants' Motion to Dismiss are hereby **DENIED,** and, likewise, the Plaintiffs' Motion to Strike is hereby **DENIED.** Because this Order does not dispose of all claims, the Court hereby **ORDERS** the parties to appear at 11:00 a.m. on Friday, September 6, 1996, for a supplemental status conference, so that appropriate deadlines may established and a trial date set.

**IT IS SO ORDERED.**